## VAN ALLEN v. THE ASSESSORS.

1. The act of June 3, 1864, "To provide a national currency," &c., rightly construed, subjects the shares of the banking associations authorized by it, and in the hands of shareholders, to taxation by the States under certain limitations (set forth in its 41st section), without regard to the fact that a part or the whole of the capital of such association is invested in national securities declared by the statutes authorizing them to be "exempt from taxation by or under State authority."

2. The act thus construed is constitutional.

3. The act of 9th March, 1865, of the legislature of New York, sometimes called the Enabling Act, and which enacts that *shares* in any of these national banking associations held by any person or body corporate shall be "included in the valuation of the personal property of such person or body corporate, in the assessment of taxes in the town or ward where such banking association is located and not elsewhere," &c., but which did not provide that the tax imposed should not exceed the rate imposed upon the shares of any of the banks organized under the authority of the State, is not warranted by the act of Congress, and is void: there having been under the legislation of the State no tax laid on *shares* in State banks at all; though there was a tax on the *capital* of such banks.

THIS was a suit involving the question of right, on the part of States, to tax shares in the national banking associations

created under the act of Congress of June, 1864. The case was thus:

By an act passed February 25th, 1863, Congress provided for the organization of national banking associations;* and the act was amended and re-enacted on the 3d June, 1864.†

By these laws the mode of organizing these associations was prescribed, their powers defined, and their duties enjoined. The Secretary of the Treasury was authorized to employ them as depositories of the public moneys, and as financial agents of the government, taking, however, sufficient security for the faithful performance of those duties. The general supervision of their action was committed to a comptroller of the currency, to be appointed by the President on the nomination of the secretary. No association could be organized with a less capital than fifty thousand dollars, or less than one hundred thousand dollars in any place with more than six thousand inhabitants; or less than two hundred thousand dollars in any place with more than fifty thousand inhabitants. The whole capital was required to be paid in within five months; fifty per centum at the commencement, and ten per centum every month thereafter. Of this capital at least one-third was required to be invested in interest-bearing bonds of the United States, which were to be deposited with the treasurer of the United States. Provision was also made for the preparation of circulating notes of different denominations, of uniform general appearance, and for the delivery to each association of an amount of these notes equal to ninety per centum of the amount of bonds deposited with the treasurer. These notes were made payable by the associations to whom they were delivered, and they were required to pay them on demand. To secure more certainly prompt redemption by the several associations of these notes and of deposits, each association was required to keep always on hand an amount of lawful money equal, in certain cities named, to twenty-five per centum, and in other places to fifteen per centum of its outstanding

---

* 12 Stat. at Large, 668.                    † 13 Id. 99.

circulation and its deposits; and to accumulate a surplus fund equal to twenty per centum of its capital. In case of default in payment by any association, the notes were to be paid by the United States, and the bonds deposited were to be either cancelled or sold, at the option of the government. The entire amount of note circulation was limited to three hundred millions of dollars, to be apportioned among the associations in the different States and Territories, partly according to the rule of representative population, and partly according to their existing banking capital, resources, and business. The notes were made receivable by all the associations for all debts and liabilities whatever; receivable by all associations employed as depositories, when deposited by the United States; receivable also by the United States for all dues except duties on imports; and by all persons for all dues from the United States, except interest on public debt.

Such are the distinguishing features of the National Banking, or National Currency Act. The general objects of the act are apparent from them.

These associations possess, under the act, all the powers necessary for carrying on the business of banking, by discounting and negotiating promissory notes, drafts, bills of exchange, and other evidences of debt; by receiving deposits, buying and selling exchange, coin, and bullion; by lending money on personal security; by obtaining, issuing, and circulating notes according to the provisions of this act, &c. The duration of the charter is twenty years.

Certain provisions, particularly ascertaining the duties and functions of these national banking associations, may thus be stated:

The persons forming an association are required to make a certificate, which shall specify, among other things, the amount of its capital stock, and the number of shares into which the same shall be divided, the names and places of residence of the shareholders, and the number of shares held by each.* The capital stock is to be divided into shares

---

* § 6.

of $100 each, and is to be deemed personal property. The shareholders of the association are to be held individually responsible, equally and ratably, and not one for another, for all contracts, debts, and engagements of such association to the extent of the amount of their stock therein at the par value, in addition to the amount invested in such shares.* In the election of directors, and in deciding all questions at meetings of shareholders, each shareholder shall be entitled to one vote on each share of stock held by him.† Fifty per cent. of the capital stock of every association must be paid in before it shall commence business, and the remainder in instalments of at least ten per cent. per month till the whole amount is paid; and if any shareholder, or his assignee, shall fail to make the payment, or any instalment on his stock, the directors may sell the stock at public auction.‡ No association can make any loan or discount on the security of the shares of its own capital.§

By the 40th section of the act of 1864 it is enacted—the act of 1863 containing no such provision—

"That the president and cashier of every such association shall cause to be kept, at all times, a full and correct list of the names and residences of all the shareholders in the association, and the number of shares held by each, in the office where its business is transacted, and such list shall be subject to the inspection of all shareholders and creditors of the association, *and the officers authorized to assess taxes under State authority*, during business hours of each day," &c.

The 41st section, of the same act of 1864, *provides by one part of it for taxation by the United States.* It imposes a tax of one per cent. annually on circulation; one-half of one per cent. on deposits, and then one-half of one per cent. on the capital *beyond the amount invested in United States bonds;* and after prescribing how the duty is to be collected, and the penalty for default, &c., the section proceeds:

(1.) "*Provided*, that nothing in this act shall be construed to

---

\* § 12.       † § 11.       ‡ §§ 14, 15.       § § 35.

prevent all the shares in any of said associations, held by any person or body corporate, from being *included in the valuation of the personal property of such person or corporation in the assessment of taxes imposed by or under State authority, at the place where such bank is located, and not elsewhere,* but not at a greater rate than is assessed upon other moneyed capital in the hands of individual citizens of such State.    (2.) *Provided further,* that the tax so imposed under the laws of any State upon the shares of any of the associations authorized by this act *shall not exceed the rate imposed upon the shares in any of the banks organized under authority of the State where such association is located.*    (3.) *Provided,* also, that nothing in this act shall exempt the real estate of associations from either State, county, or municipal taxes to the same extent, according to its value, as other real estate is taxed."

With this statute of the Federal Government, authorizing banking associations, in force, the legislature of New York, on the 9th March, 1865, passed " an act, enabling the banks of this State to become associations for the purposes of banking, under the laws of the United States."*    The act, frequently called " The Enabling Act," imposed a tax upon all shares in national banks, in the hands of their holders. The section laying the tax ran thus:

" § 10. All the *shares* in any of the said banking associations, organized under . . . the act of Congress, held by any person or body corporate, shall be included in the valuation of the personal property of such person or body corporate or corporation, in the assessment of taxes in the town or ward where such banking association is located, and not elsewhere, whether the holder thereof reside in such town or ward, or not; but not at a greater rate than is assessed upon other moneyed capital in the hands of individuals of this State, provided that the tax so imposed upon such shares shall not exceed the par value thereof; and provided further, that the real estate of such associations shall be subject to State, county, or municipal taxes, to the same extent, according to the value, as other real estate is taxed."

This act, it will be noted, *laid no rate or tax whatever "upon*

---

* Session Acts of 1865; chap. 97.

*the shares* in any of the banks organized under the authority of *the State,*" as seems to have been contemplated as necessary by the second proviso of the 41st section of the National Banking Act of 1864; and, indeed, under the legislation of New York, as it appeared, no rate or tax whatever was laid upon *shares* in State banks at all; though there was one laid on their *capital*.

However, assuming the validity of this State law whether with or without this proviso, the Board of Assessors, at the city of Albany, assessed one Van Allen for fifty shares, owned by him, of the capital stock of the First National Bank of that city, and assessed all the other shareholders in like manner for theirs. *At the time of the assessment, the whole capital of the bank was invested in various obligations of the Federal Government; in regard to all of which, Congress had enacted that, " whether held by individuals, corporations, or associations," they should be " exempt from taxation by or under State authority.*"

Van Allen and the other stockholders insisted before the board that the shares of the bank held by them, as stockholders, were not subject to assessment and taxation under State authority; that the enabling act of the New York legislature of 9th March, 1865, was repugnant to the Constitution of the United States, and also to the laws of the United States. These positions the board denied, and it enforced the tax which had been assessed. On a case stated by the stockholders on the one side, and the Board of Assessors on the other, the question was now taken to the Supreme Court of the State, and thence to the Court of Appeals. This latter court—the highest court of law or equity of the State—having affirmed the authority of the Board of Assessors to lay the tax, the case came here on error.*

Other cases like it, and represented by counsel, were also here from different places in New York. The magnitude

---

* Of course, under the 25th section of the Judiciary Act; with whose provisions the reader is familiar. See *supra*, p. 57, The Binghamton Bridge.

of the interests concerned will be readily conceived from the fact mentioned at the bar, that, in December, 1865, the amount of stock in these National Banks, at its par value—and the amount, therefore, either subject or not subject, according as this case should be decided, to taxation by the States—was:

| In the State of New York, | . | . | . | . | $115,217,941 00 |
| In the Union, | . | . | . | . | 404,159,493 00 |

That the reader may be possessed not only of the essential case, but of some of its important incidents, it may be well to mention that, prior to the enactment of either of the National Banking laws, and while its State Bank system was in operation, the legislature of New York (A. D. 1857) had enacted that the capital stock of the banks of the State should be " assessed at its actual value, and taxed in the same manner as other personal and real estate of the country." With the State system and the enactment just mentioned in force, several of the banks of New York became, soon after the rebellion broke out, owners of large amounts of the bonds of the United States, and in regard to which, as already said, Congress had, in the statute authorizing them, enacted* that, " whether held by individuals or *corporations*, they shall be exempt from taxation by or under *State* authority." On a question between those banks as formed under the general State system in New York, and the tax commissioners of the State, this court decided, in March, 1863, in the *Bank of Commerce* v. *New York City*,† that the tax referred to was a tax upon the *stock;* and that being so, it was by the settled law of this court—as declared in *Weston* v. *The City of Charleston;*‡ *McCulloch* v. *The State of Maryland;*§ *Osborne* v. *The Bank of the United States*‖ (well known decisions of this court, and in which MARSHALL, C. J., had given its judgment), and other cases—illegally imposed.

In April, 1863, just after this decision, the legislature of New York passed *another* statute,¶ which enacted that " all

---

* Act of February 25, 1862.

‡ 2 Peters, 449.

‖ 9 Id. 738.

† 2 Black, 620.

§ 4 Wheaton, 316.

¶ Act of 29th April, 1863.

banks, &c., should be liable to taxation on a *valuation equal to the amount of their capital stock paid in, or secured to be paid in,* &c., in the manner now provided by law," &c. On a tax laid, under *this* act, by the commissioners, upon the different banks of New York city, some of which had invested their whole capital in the securities of the Federal Government, and others of which had largely done so, the question was, whether this second act did or did not also impose a tax upon the *stock?* This court, on appeal from the highest court of the State, decided, in the beginning of 1865, in what is known as the *Bank Tax Case,** that it did. It was within a few days after that decision that the enactment on which the present case arose—a third enactment in the principal matter—was made. Its language was obviously directed to avoid some difficulties which had proved insurmountable in the *Bank Tax Case,* and in cases before it. Whether it did really avoid them, or whether the new legislation of the State had the fault of exalting the forms and phrases of legislation above its substance and effect, was, in fact, one great question in the case; others being (i) whether Congress had meant, by the first proviso to the 41st section of the act of 1864, to authorize States to lay a tax on shares in National Banks whose whole capital consisted of national securities, declared in the laws authorizing them to be exempt from taxation by States; and (ii) whether; if it did, such an act would or would not be open to the objection of being an attempt by Congress to deliver over to others, powers vested by the Federal Constitution in it alone; and be, therefore, an act unconstitutional.

A minor question—treated preliminarily—was, whether, admitting the power of the State, under the provisos of the 41st section of the act of Congress, to tax the shares by an enactment framed with the limitations prescribed by the three provisos in it, this particular act of the State of New York, passed March 9, 1865, which apparently omitted the second one, was an enactment of the kind required?

---

* 2 Wallace, 200.

Numerous counsel appeared in the matter; some in this immediate case, others in other cases just like it from the other places. Among them *Mr. Evarts*, *Mr. Sedgwick*, *Mr. Tremaine*, *Messrs. Edmonds* and *Miller*, argued against the right of the States to tax, and *Mr. Kernan*, *Mr. A. J. Parker*, and *Mr. Reynolds* in favor of it. After naming such counsel it need not be remarked that everything possible to be well said was said as well as possible. The fact that the main matter is fully and admirably argued from the bench—in the opinion of the court on the one hand, and in the opinion delivered in behalf of the judges who did not concur in it on the other—renders it unnecessary for the reporter to present the discussion at the bar.

Mr. Justice NELSON delivered the opinion of the court.

The decree of the Court of Appeals, from which this case comes to us, must be reversed, on the ground that the enabling act of the State of New York, passed March 9, 1865, does not conform to the limitations prescribed by the forty-first section of the act of Congress, passed June 3, 1864, organizing the national banks, and providing for their taxation. The defect is this: one of the limitations in the act of Congress is, "that the tax so imposed under the laws of any State upon the shares of the associations authorized by this act, shall not exceed the rate imposed upon the shares of any of the banks organized under the authority of the State where such association is located." The enabling act of the State contains no such limitation. The banks of the State are taxed upon their capital; and although the act provides that the tax on the shares of the national banks shall not exceed the par value, yet, inasmuch as the capital of the State banks may consist of the bonds of the United States, which are exempt from State taxation, it is easy to see that this tax on the capital is not an equivalent for a tax on the shares of the stockholders.

This is an unimportant question, however, as the defect may be readily remedied by the State legislature.

The main and important question involved, and the one

which has been argued at great length and with eminent ability, is, whether the State possesses the power to authorize the taxation of the shares of these national banks in the hands of stockholders, whose capital is wholly vested in stock and bonds of the United States?

The court are of opinion that this power is possessed by the State, and that it is due to the several cases which have been so fully and satisfactorily argued before us at this term, as well as to the public interest involved, that the question should be finally disposed of. I shall proceed, therefore, to state, as briefly as practicable, the grounds and reasons that have led to their judgment in the case.

The first act providing for the organization of these national banks, passed 25th February, 1863, contained no provision concerning State taxation of these shares; but Congress reserved the right by the last section at any time " to amend, alter, or repeal the act." The present act of 1864 is a re-enactment of the prior statute, with some material amendments, of which the section concerning State taxation is one.

It will be readily perceived, on adverting to the act, that the powers and privileges conferred by it upon these associations are very great powers and privileges;—founded upon a new use and application of these government bonds, especially the privilege of issuing notes to circulate in the community as money, to the amount of ninety per centum of the bonds deposited with the treasurer; thereby nearly doubling their amount for all the operations and business purposes of the bank. This currency furnishes means and facilities for conducting the operations of the associations, which, if used wisely and skilfully, cannot but result in great advantages and profits to all the members of the association—the shareholders of the bank.

In the granting of chartered rights and privileges by government, especially if of great value to the corporators, certain burdens are usually, if not generally, imposed as conditions of the grant. Accordingly we find them in this charter. They are very few, but distinctly stated.

They are, first, a duty of one-half of one per centum each half year, upon the average amount of its notes in circulation; second, a duty of one-quarter of one per centum each half year upon the average amount of its deposits; third, a duty of one-quarter of one per centum each half year on the average amount of its capital stock beyond the amount invested in United States bonds; and fourth, a State tax upon the shares of the association held by the stockholders, not greater than assessed on other moneyed capital in the State, nor to exceed the rate on shares of stock of State banks.

These are the only burdens annexed to the enjoyment of the great chartered rights and privileges that we find in this act of Congress; and no objection is made to either of them except the last,—the limited State taxation.

Although it has been suggested, yet it can hardly be said to have been argued, that the provision in the act of Congress concerning the taxation of the shares by the State is unconstitutional. The suggestion is, that it is a tax by the State upon the bonds of the government which constitute the capital of the bank, and which this court has heretofore decided to be illegal. But this suggestion is scarcely well founded; for were we to admit, for the sake of the argument, this to be a tax of the bonds or capital stock of the bank, it is but a tax upon the new uses and new privileges conferred by the charter of the association; it is but a condition annexed to the enjoyment of this new use and new application of the bonds; and if Congress possessed the power to grant these new rights and new privileges, which none of the learned counsel has denied, and which the whole argument assumes, then we do not see but the power to annex the conditions is equally clear and indisputable. The question involved is altogether a different one from that decided in the previous bank cases, and stands upon different considerations. The State tax, under this act of Congress, involves no question as to the pledged faith of the government. The tax is the condition for the new rights and privileges conferred upon these associations.

But, in addition to this view, the tax on the shares is not

a tax on the capital of the bank. The corporation is the legal owner of all the property of the bank, real and personal; and within the powers conferred upon it by the charter, and for the purposes for which it was created, can deal with the corporate property as absolutely as a private individual can deal with his own. This is familiar law, and will be found in every work that may be opened on the subject of corporations. A striking exemplification may be seen in the case of the *Queen* v. *Arnoud.** The question related to the registry of a ship owned by a corporation. Lord Denman observed: "It appears to me that the British corporation is, as such, the sole owner of the ship. The individual members of the corporation are no doubt interested in one sense in the property of the corporation, as they may derive individual benefits from its increase, or loss from its decrease; but in no legal sense are the individual members the owners."

The interest of the shareholder entitles him to participate in the net profits earned by the bank in the employment of its capital, during the existence of its charter, in proportion to the number of his shares; and, upon its dissolution or termination, to his proportion of the property that may remain of the corporation after the payment of its debts. This is a distinct independent interest or property, held by the shareholder like any other property that may belong to him. Now, it is this interest which the act of Congress has left subject to taxation by the States, under the limitations prescribed, as will be seen on referring to it. ·

That act provides as follows:

"That nothing in this act shall be construed to prevent all the shares of any of the said associations, held by any person or body corporate, from being included in the valuation of personal property of such person or corporation in the assessment of taxes imposed by and under State authority, at the place where such bank is located, and not elsewhere, but not *at a greater rate than is assessed upon other moneyed capital in the hands*

---

* 9 Adolphus & Ellis, New Series, 806.

*of  individual citizens of such State;* PROVIDED *further, that the tax so imposed under the laws of any State, upon the shares of the associations, authorized by this act, shall not exceed the rate imposed upon the shares of any of the banks organized under the authority of the State where such association is located:* PROVIDED, also, that nothing in this act shall exempt the real estate of associations from either State, county, or municipal taxes, to the same extent, according to its value, as other real estate is taxed."*

It is said that Congress possesses no power to confer upon a State authority to be exercised which has been exclusively delegated to that body by the Constitution, and, consequently, that it cannot confer upon a State the sovereign right of taxation; nor is a State competent to receive a grant of any such power from Congress. We agree to this. But as it respects a subject-matter over which Congress and the States may exercise a concurrent power, but from the exercise of which Congress, by reason of its paramount authority, may exclude the States, there is no doubt Congress may withhold the exercise of that authority and leave the States free to act. An example of this relation existing between the Federal and State governments is found in the pilot-laws of the States, and the health and quarantine laws. The power of taxation under the Constitution as a general rule, and as has been repeatedly recognized in adjudged cases in this court, is a concurrent power. The qualifications of the rule are the exclusion of the States from the taxation of the means and instruments employed in the exercise of the functions of the Federal Government.

The remaining question is, has Congress legislated in respect to these associations, so as to leave the shares of the stockholders subject to State taxation?

We have already referred to the main provision of the act of Congress on this subject, and it will be seen it declares " that nothing in this act shall be construed to prevent *all the shares* in any of the said associations, held by any person, or body corporate, from being included in the valuation of

* § 41.

the personal property of such person or corporation in the assessment of taxes imposed by or under State authority, at the place where such bank is located :" and in another section of the act* it is declared " that the president and cashier of every such association shall cause to be kept, at all times, a full and correct list of the names and residences of all the shareholders in the association, and the number of shares held by each, in the office where its business is transacted, and such list shall be subject to the inspection of all shareholders and creditors of the association, *and the officers authorized to assess taxes under State authority*, during business hours of each day," &c.

These two provisions—the one declaring that nothing in the act shall be construed to prevent the shares from being included in the valuation of the personal property, &c., in the assessment of taxes imposed by State authority; and the other providing for the keeping of the list of the names and residences of the shareholders, among other things, for the inspection of the officers authorized to assess the State taxes —not only recognize, in express terms, the sovereign right of the State to tax, but prescribe regulations and duties to these associations, with a view to disembarrass the officers of the State engaged in the exercise of this right. Nothing, it would seem, could be made plainer, or more direct and comprehensive on the subject. The language of the several provisions is so explicit and positive as scarcely to call for judicial construction.

Then, as to the shares, and what is intended by the use of the term? The language of the act is equally explicit and decisive.

The persons forming an association are required to make a certificate, which shall specify, among other things, the amount of its capital stock, and the number of shares into which the same shall be divided, the names and places of residence of the shareholders, and the number of shares held by each.† The capital stock shall be divided into shares of

---

* 40                                    † § 8.

one hundred dollars each, and shall be deemed personal property. The shareholders of the association shall be held individually responsible, equally and ratably, and not one for another, for all contracts, debts, and engagements of such association to the extent of the amount of their stock therein at the par value, in addition to the amount invested in such shares.* In the election of directors, and in deciding all questions at meetings of shareholders, each shareholder shall be entitled to one vote on each share of stock held by him.† Fifty per centum of the capital stock of every association shall be paid in before it shall commence business, and the remainder in instalments of at least ten per centum per month till the whole amount is paid; and if any shareholder, or his assignee, shall fail to make the payment, or any instalment on his stock, the directors may sell the stock at public auction.‡ No association shall make any loan or discount on the security of the shares of its own capital.§

We have already referred to the list of the names and residences of the shareholders, and the number of shares, to be kept for the inspection of the State assessors.

Now, in view of these several provisions in which the term shares, and shareholders, are mentioned, and the clear and obvious meaning of the term in the connection in which it is found, namely, the whole of the interest in the shares and of the shareholders; when the statute provides, that nothing in this act shall be construed to prevent *all the shares* in any of the said associations, &c., from being included in the valuation of the personal property of any person or corporation in the assessment of taxes imposed by State authority, &c., can there be a doubt but that the term " shares," as used in this connection, means the same interest as when used in the other portions of the act? Take, for examples, the use of the term in the certificate of the numbers of shares in the articles of association, in the division of the capital stock into shares of one hundred dollars each; in the personal liability clause, which subjects the shareholder to an

---

\* § 12.  † § 11.  ‡ §§ 14, 15.  § § 35.

amount, and, in addition, to the amount invested in such shares; in the election of directors, and in deciding all questions at meetings of the stockholders, each share is entitled to one vote; in regulations of the payments of the shares subscribed; and, finally, in the list of shares kept for the inspection of the State assessors. In all these instances, it is manifest that the term as used means the entire interest of the shareholder; and it would be singular, if in the use of the term in the connection of State taxation, Congress intended a totally different meaning, without any indication of such intent.

This is an answer to the argument that the *term*, as used here, means only the interest of the shareholder as representing the portion of the capital, if any, not invested in the bonds of the government, and that the State assessors must institute an inquiry into the investment of the capital of the bank, and ascertain what portion is invested in these bonds, and make a discrimination in the assessment of the shares. If Congress had intended any such discrimination, it would have been an easy matter to have said so. Certainly, so grave and important a change in the use of this term, if so intended, would not have been left to judicial construction.

Upon the whole, after the maturest consideration which we have been able to give to this case, we are satisfied that the States possess the power to tax the whole of the interest of the shareholder in the shares held by him in these associations, within the limit prescribed by the act authorizing their organization. But, for the reasons stated in the forepart of the opinion, the judgment must be reversed and the case remitted to the Court of Appeals of the State of New York, with directions to enter judgment for the plaintiffs in error, with costs.

The CHIEF JUSTICE delivered the following opinion in his own behalf, and in behalf of Associate Justices WAYNE and SWAYNE:

The court is unanimous in the opinion that the judgment of the Court of Appeals of New York must be reversed, be-

cause the shares of the national banking associations are not taxed by the law of New York according to one branch of the rule prescribed by the act of Congress; that is to say, as the shares of the banks of the State are taxed.

A minority of the members of the court, however, is unable to concur upon one very important point, with the opinion just read.

That opinion maintains the proposition, that under the national currency acts, the shares of the capital of national banking associations are subject to State taxation without any reference to the amount of such capital invested in bonds of the United States.

We think that such taxation is actual, though indirect, taxation of the bonds; that it is matter of doubt whether, under the Constitution, Congress has power, without express reservation in the loan acts, to authorize such taxation; and that taxation by the States of the shares of national banking associations, without reference to the amount of the capital invested in national securities, is not authorized, nor was intended to be authorized by Congress.

We will proceed to state the grounds of this opinion.

By an act passed February 25th, 1863, Congress provided for the organization of national banking associations for the purpose of enabling the national government to execute more effectually its constitutional powers and functions; and the act was amended and re-enacted on the 3d June, 1864.

It is unnecessary to examine minutely the various provisions by which the powers and duties and functions of these national banking associations are particularly ascertained and regulated. The general purpose of the act of Congress cannot be misconceived. It is to authorize the organization of associations to be employed, not only in the service of the government as depositories and financial agents, but especially in facilitating the collection of internal duties, and the transfer and disbursement of public moneys, and in furnishing to the people a safe and uniform note circulation, convertible immediately into notes of the United States, and to be made convertible into coin as soon as the

government shall provide for the payment of its own notes in that medium.

The qualities, powers, and duties, as national agencies, of these associations, resemble, in almost all essential particulars, those of the Bank of the United States authorized by the act of April 10th, 1816. Like that bank, they are organized under national legislation. Their capital, like four-fifths of the capital of that bank, is supplied by individual subscriptions. They are employed, like that bank, as agents and depositories of the national government.

While that bank, however, was organized as one great moneyed corporation, with power to establish branches in the several States, subject to its central power, these associations, under the limitations prescribed by Congress, are formed whenever and wherever citizens, possessing the necessary means, see fit to organize under the law; and they are subject to no control except that of the government executing the law. It is also to be remembered that while the notes of that bank represented nothing but securities held by the bank itself, and were expected to form but a small part of the note circulation of the country, the notes of these associations, besides being secured as to immediate redemption by the several associations, which pay them out, through the deposit of United States bonds, are, in substance and to all practical intents, the obligations of the government itself; and are intended, in connection with the notes issued directly by the government, to supply the entire note circulation of all the States and all the Territories of the Union.

These observations show that the national banking associations are much more intimately connected in their functions and operations with the national government, than was the Bank of the United States. They are, therefore, entitled to all the protection and all the immunities to which that bank was entitled.

The relations of that bank to the government, and its right to protection from State interference and control, were fully considered in the case of *McCulloch* v. *The State of Mary-*

*land,* decided in 1819, and again in the case of *Osborne* v. *The Bank of the United States,* decided in 1824.

That Congress may constitutionally organize or constitute agencies for carrying into effect the national powers granted by the Constitution; that these agencies may be organized by the voluntary association of individuals, sanctioned by Congress; that Congress may give to such agencies, so organized, corporate unity, permanence, and efficiency; and that such agencies in their being, capital, franchises, and operations, are not subject to the taxing power of the States, have ever been regarded, since those decisions, as settled doctrines of this court.

Those decisions were the judgments of great men and great judges. They were pronounced by the most illustrious of their number, and are distinguished by his peculiar clearness and cogency of reasoning. For nearly half a century the principles vindicated by them have borne the keen scrutiny of an enlightened profession, and the sharp criticism of able statesmen; and they remain unshaken. All the judges who concurred in them have descended, long since, into honored graves; but their judgments endure, and, gathering vigor from time and general consent, have acquired almost the force of constitutional sanctions.

We assume, then, that the national banking associations, as such, and in their powers, functions, and operations, are not subject to taxation by the States, on the ground that State laws imposing such taxation are repugnant to the law of Congress by which they are established and sanctioned.

The same principle of exemption was applied in 1829, by a judgment of this court in the case of *Weston* v. *The City of Charleston,** to the bonds and other securities of the United States in the hands of individuals. The opinion was delivered by the same great judge who pronounced the two former judgments, and the doctrine was summed up thus:

" The tax on government stock is thought by this court to be a tax on the contract, a tax on the power to borrow money on

---

* 2 Peters, 449.

the credit of the United States, and consequently to be repugnant to the Constitution; and this doctrine has ever since been maintained as settled law."

More recently the same principle has been applied generally to the taxation of the capital of associations and corporations, so far as invested in national securities.

This was first done in the case of the *Bank of Commerce* v. *New York.*\* The legislature of New York imposed taxes on banking capital as upon other real and personal property of individuals according to valuation. This court held that the bonds and other securities of the United States, included in such valuation, were not liable to be taxed by State authority.

The legislature of New York subsequently provided for the taxation of the capital of banks by an arbitrary valuation; that is to say, by requiring the valuation for taxation to be equal to the sum of the capital paid in and secured to be paid in, without reference to its actual value at the time of valuation; and it was then insisted, in behalf of the State commissioners of taxes, that this was a tax on the franchise and not on the property, and that no inquiry could be made, therefore, as to the component elements of the capital, with a view to ascertain whether any of them were exempt from taxation. But this court held that the tax was really on the property of the bank, and could not be constitutionally assessed upon that part of it which consisted of national bonds and securities.†

And it may now be regarded as settled law that the national securities forming part of the property of individual citizens or associations, or of the capital of banks or banking associations, are not subject to taxation by or under State authority.

But it was urged in argument that, though the capital of a bank, so far as it consists of national securities, is exempt from State taxation, the shares of that capital may be taxed

---

\* 2 Black, 628.          † Bank Tax Case, 2 Wallace, 200.

without reference to the legislation of Congress, and without regard to the national securities which they represent.

If this were admitted, it would follow that the legislature of New York, by merely shifting its taxation from the capital to the shares, might have avoided the whole effect of the exemptions sanctioned by the decisions just cited. The same tax on the same identical property, without any exemption of national securities, might have been assessed and collected by adopting the simple expedient of assessment on the shares of capital, instead of the aggregate of capital—on the parts instead of the whole. The whole tax, too, might have been collected from the very same officers who were authorized by those decisions to refuse payment of so much of it as was derived from national securities, by adopting the equally simple expedient of requiring those officers to deduct the tax on the shares from the accruing dividends, and pay it over to the State collector.

We do not understand the majority of the court as asserting that shares of capital invested in national securities could be taxed without authority from Congress. We certainly cannot yield our assent to any such proposition. To do so would, in our judgment, deprive the decisions just cited of all practical value and effect, and make the exemption from State taxation of national securities held by banks as investments of capital wholly unreal and illusory.

We will consider the question, therefore, as one of construction.

The majority of the court hold that the act of Congress, rightly construed, subjects the shares of the national associations to taxation by the States, without regard to investment of a part or the whole of their capital in national securities ; and that the act thus construed is warranted by the Constitution. We dissent.

It may be well questioned, in our judgment, whether Congress has power under the Constitution to authorize State taxation of national securities, either directly or indirectly. Taxation of national securities is taxation upon the contracts of the United States, and may be regarded, not unrea-

sonably, as impairing their obligation, unless provision is made for such taxation in the laws authorizing the loans for which they are issued. It is not alleged that any such provision is contained in the acts under which the government issued the bonds held by the national banking associations. On the contrary, these acts contain express stipulations with the national creditors that the bonds issued under them shall be exempt from taxation by or under State or municipal authority. This is, in effect, a stipulation on the part of Congress that the takers of the government loan shall have the right to use the bonds issued to them for any lawful purpose, free from State or municipal taxation.

Can Congress, notwithstanding this stipulation, authorize States to tax these bonds indirectly by taxing the capital or the shares of capital invested in them?

There is sufficient reason, we think, for a negative answer, to make it our duty not to presume without the clearest evidence that Congress has actually authorized such taxation. And were the power to authorize such taxation clear, a superior question would remain,—the question of good faith, of public virtue, of national honor.

We come, then, to the construction of the act.

In enacting the National Bank Law, Congress must have had in view the great principles already established by the decisions of this court: (1) that States cannot tax the agencies of the national government; (2) that States cannot tax the national securities in the hands of individual citizens; (3) that States cannot tax the national securities in which may be invested the whole or a part of the capital of any association or corporation.

They also had in view, doubtless, the exception to exemption suggested by Chief Justice Marshall, in *McCulloch* v. *Maryland*, when he said that the opinion of the court did "not extend to a tax paid by the real property of the bank in common with the real property within the State, nor to a tax imposed on the interest which the citizens of Maryland might hold in the institution in common with the property of the same description throughout the State."

With these principles and this exception in view, Congress, in order that nothing might be left to inference, expressly authorized State taxation of the real estate held by the national banking associations, and of the interest of private citizens in them. This was done by three provisos to the forty-first section, which prescribed the measure and rule of national taxation. These provisos are as follows:

(1.) "*Provided*, that nothing in this act shall be construed to prevent all the shares in any of said associations, held by any person or body corporate, from being included in the valuation of the personal property of such person or corporation in the assessment of taxes imposed by or under State authority, at the place where such bank is located, and not elsewhere, but not at a greater rate than is assessed upon other moneyed capital in the hands of individual citizens of such State. (2.) *Provided further*, that the tax so imposed under the laws of any State shall not exceed the rate imposed upon the shares in any of the banks organized under authority of the State where such association is located. (3.) *Provided also*, that nothing in this act shall exempt the real estate of associations from either State, county, or municipal taxes to the same extent, according to its value, as other real estate is taxed."

We do not doubt the power of Congress to enact these provisos. The only ground upon which exemption from State taxes of the capital, franchises, operations, or property of corporations or associations has been adjudged by this court, is that of the repugnancy of such taxation to the acts of Congress organizing such corporations or associations, and making them the agencies or instruments of the national government.

The doctrine is, that Congress may create corporations or authorize associations, as means, instruments, or agents for the execution of national powers, and that such corporations or associations, being such means, instruments, or agents, are exempted from State taxation. But such corporations and associations must be organized in such manner, under such limitations, and with such liabilities as Congress may see fit to prescribe. If in the judgment of Congress, there-

fore, the purposes of their organization will be better, or more safely fulfilled if subjected, in some respects, to State taxation, the acts authorizing their establishment may be so framed as to allow such taxation, excepting, probably, national securities, as already suggested.

We proceed to consider the effect of these provisos; pausing only to observe that there is nothing in the suggestion of Chief Justice Marshall, in conformity with which they were probably framed, which warrants any inference that it ever entered into his mind that the national stock or bonds could be taxed indirectly, by taxing the interest of citizens in the Bank of the United States. The question of State taxes upon national securities was not at all considered in that case. If it had been, we cannot doubt that the clear intelligence, under the inspection of which all propositions seemed to resolve themselves into their elements, would have detected taxation of bonds under the disguise of taxation of the capital or shares of capital in which they were invested, and would have pronounced against the indirect as decisively as it did afterwards, in *Weston* v. *Charleston*, against the direct taxation.

What, then, was the intent of Congress? We think it not very difficult to collect it from the provisos.

In most of the States, if not in all, the personal property of all individuals and corporations is listed, valued and assessed by public officers under legislative authority. The first proviso simply requires that the shares of individuals in national banking associations shall be included in this valuation and assessment; and, inasmuch as personal property of different descriptions is often valued and assessed by different rules, it further requires that it shall not be so included at a greater rate than is assessed upon other moneyed capital in the hands of citizens. The second proviso merely introduces another standard, by comparison with which the taxation of these shares is to be regulated, and requires that the tax imposed on them shall not exceed the rate imposed by the State on the shares of banks organized under its authority.

We think this the plain sense of these provisos. They adopt the exception admitted by Chief Justice Marshall to the rule of exemption in *McCulloch* v. *Maryland.* They subject the interests held by citizens in the national banking associations to a tax in common with other property of the same description, and they give to the exception a practical application by determining what property is of the same description with the interest to be taxed in common with it.

Now, by taxation in common, we understand taxation by a common rule and in equal degrees. To tax the shares of citizens in these associations by other rules, or in greater degrees than other like property, would as effectually retard, impede, burden, and control the operation of the national currency act as to tax the associations themselves or their lawful operations, and would be clearly unwarranted by the Constitution.

What then is the rule, and what the degree in which taxes can be imposed by the States on moneyed capital in the hands of individual citizens?

So far as that capital consists of ordinary funds or securities acquired or held under the laws of the States, the measure of taxation must necessarily be determined by the discretion of the State legislature. The responsibility of their members to the people, their own interests in common with those of their constituents, their knowledge, their justice, and their wisdom must be relied on for security against injustice. But so far as that capital consists of bonds or other securities of the United States, it cannot be taxed at all by State authority in the hands of individual citizens. That portion is exempted by the Constitution, as interpreted by this court in the cases already cited.

Here, then, we have the common rule and common degree of taxation applicable alike to shares in national banking associations and to moneyed capital in the hands of individuals. That proportion of each which is liable to taxation must be taxed alike; that proportion of each which is exempt under the Constitution must not be taxed at all by State authority. Taxation of the former by no greater rate

than the latter, means equal taxation for both. Any construction of the proviso which denies the same exemptions to the proportion of the shares invested in national securities, which it concedes to the like proportion of other moneyed capital invested in like manner, seems to us manifestly at variance with the declared intention of Congress.

But, it is insisted that the shares of capital may be taxed by another rule than that which governs the taxation of other moneyed capital, because of something peculiar in the nature of shares. It is said, that the association owns the capital, and that the shareholders have no control over this property except through the choice of officers, directors, or agents, and no right to the property except the right to receive a due proportion of the earnings of the association while it exists, and a similar proportion of the property after its dissolution.

It is true that the shareholder has no right to the possession of any part of the corporate property while the corporation exists and its affairs are honestly managed. He has committed his interest, for a time, to the possession and control of the corporation of which he is a member, and he has only a member's voice in the management of it.

So a man who has leased a farm has no right to possession or control during the lease; but who denies his property in the farm? And if a dozen owners join in the lease, has not each one an interest in the property to the extent of one-twelfth?

So, if for the time the property of the shareholder is placed beyond his direct control, and converted into property of the association, how can that circumstance affect the intrinsic character of his shares as shares of the whole corporate property? How can a man's shares of any property be the subject of valuation at all if not with reference to the amount and productiveness of the property of which they are a part? What value can they have except that given them by that amount and that productiveness? A certificate of title to a share is not a share. It is evidence of the shareholder's interest. His interest may be transferred by the transfer of

the certificate; but it is not the certificate that is valued when the worth of the share is estimated either by the speculator in the market, or by the tax assessor.   It is the property which it represents that is valued, by the speculator often with reference to speculation only, but by the public officer, always, if he does his duty, by the real worth of the property, all things considered.

It is said, also, that the taxation of the shares by the States was intended as part of the price of the privileges granted to the associations by Congress, and especially for the new use allowed to be made of the bonds by depositing them as security for the redemption of the circulating notes issued to the associations by the government.

But while we see privileges granted in the act to these associations, in order that they may fulfil the public purposes of their organization, and while we see that these privileges may enhance the value of the capital invested and consequently the value of the shares, we see no new use allowed to be made of the bonds.   It has been common in many States, of late years, to require banks of circulation to secure prompt redemption by securities deposited with the State officers, and among such securities preference is usually given to bonds of the United States.   But this is for the benefit and security of the note-holders, not of the banks. The requirement restricts rather than increases the amount of their circulation.

These privileges, moreover, and the new use, if there be one, are granted directly to the associations, and only indirectly to the shareholders; and if the right to tax is to be inferred from consent manifested by organization under the act, the tax should be imposed on the capital of the associations rather than upon the shares.   And we may remark, also, that the imagined new use is restricted to the limited amount of bonds required as security for circulation, while the greater part of the bonds, held by the associations, are not so pledged at all, and no such reason as new use or special privileges can be alleged for denying exemption to them.

It is worthy of notice, that the banks of New York, whose

claim to the exemption of the bonds held by them from State taxation was held valid by the two decisions we have cited, were organized upon the same principles with the national banking associations which now claim a similar exemption. The same privileges, substantially, were conferred on those institutions by the laws of New York as are conferred on these by act of Congress. The former were allowed to issue an amount of currency proportioned to the bonds deposited by them with the bank superintendent, just as the latter are allowed to issue an amount proportioned to the bonds deposited by them with the treasurer of the United States. If the tax is the price of privilege in the case of the latter, so it must have been in the case of the former. If it is a duty on the new use of bonds by national banking associations, it was a duty on the same new use by the New York banks. If consent of the former to taxation could be inferred from organization, so could the consent of the latter. And yet it was held, in the New York bank cases, that the tax could not reach the bonds which made a part of the capital, while it is now held that it may be imposed on the shares of the capital invested partly or wholly in these bonds. Surely no argument drawn from new use or price of privilege can be valid for the latter tax which was not valid for the former.

The truth is, we think that Congress, when providing for State taxation of shares, had no reference whatever to any new use of bonds or any price of privilege. The national legislature was engaged in providing a uniform currency for the whole country, and for its circulation and redemption. For this and other great national purposes the organization of the national banking associations was authorized, and it was expected that these associations would take the place of the State banks, from taxes on which the States derived considerable revenues. It was to remove the objections to the new system, founded on the loss of this revenue through the conversion of State banks into national associations, that Congress authorized the taxation of shares by the States. This taxation should be allowed to the extent of

the concession of Congress. That concession limits it to the same taxation as the States impose on moneyed capital in the hands of individuals, in whose hands the proportion invested in national bonds is exempt. There is no reason for extending taxation on shares beyond that concession.

But it is urged that other provisions in the act of Congress require that construction of the proviso which allows taxation on shares without deduction of investments in national securities. We think otherwise.

One of these provisions is that which requires the capital to be divided into shares of one hundred dollars each. This provision only shows that, at the outset, each share of paid up capital represented a property interest in the association, bearing the same proportion to the whole that one hundred dollars bore to the entire capital.

The only other provision much relied on as favoring the construction of the majority, is that clause of the fortieth section which requires the officers of the several associations to keep correct lists of the names and residences of the shareholders, subject to the inspection of shareholders and creditors, and of the officers authorized to assess taxes under State authority. But is it not obvious that this list would be as useful to the State officers in valuing the shares with exemption of bonds, as in valuing them without exemption?

It is said that exemption would embarrass valuation. How? All the assessor would have to do, would be to ascertain the value of the whole property of the association and deduct the amount of bonds. The remainder, divided by the number of shares, would give the value of each share to be taxed. And the assessor must value the whole property and divide it by the number of shares, in order to make a true valuation of shares. If he does not do this, he must assess the shares at an arbitrary or speculative valuation. This is not what is required. The law demands true valuation; and true valuation, with deduction of bonds, places the shareholder on exact equality with the holder of other moneyed capital, which the law also demands. No other mode of valuation secures that equality.

There is another provision of the act which appears to us conclusive of the correctness of our view. It is that clause of the 41st section which provides for taxation by the United States. It imposes a tax of one per centum annually on circulation; one-half of one per centum on deposits; and, then, one-half of one per centum on the capital, beyond the amount invested in United States bonds. Is it possible that Congress observed so scrupulously the obligations of good faith as to refuse to tax capital invested in bonds for national purposes, and this in the midst of war, and was yet so negligent of those obligations as to allow the same capital invested in bonds to be taxed in shares, for State purposes? Can it be supposed that Congress, having undoubted power to tax national securities, refrained from exercising it because its exercise would be inconsistent with good faith, and yet intended, by ambiguous phrases, and in the exercise of questionable constitutional authority, to authorize such taxation by the States who, without such authority, could not impose it at all? Suppose that, by this clause, Congress had imposed double the amount of tax actually assessed, and had provided for the payment of half of it to the States. That would have provided an indemnity to the States for the loss of taxes on the State banks, and would have subjected the national bonds to no tax. Is it reasonable to believe that Congress intended to adopt another mode of indemnity, which, by indirection, would subject those bonds to heavy taxation, and that by the States?

To us these questions seem to answer themselves. We are entirely satisfied that the construction of the proviso and the rule for valuation of shares, which we have endeavored to vindicate, is the true one, and the only one consistent with sound principle and perfect faith. We dissent, on this point, from the majority of the court with reluctance; but we are constrained to dissent.

We concur with the majority of the court as to the effect of the second proviso.

The laws of New York, brought under review in the case before us, provide for the taxation of the shares of the na-

-tional banking associations, and for the taxation of the cap-
ital of State banks, but not of the shares; while the second
proviso of the act of Congress requires that the tax on the
shares of the former shall not exceed the tax on the shares
of the latter. It is clear that this taxation by the State is
not in accordance with the authority given by Congress.
The variance might not be a matter of much practical im-
portance, if we agreed in opinion that taxation on capital
and shares must be by the same rule; but the application
of the rule of exemption, heretofore sanctioned, to the cap-
ital of the State banks, while the rule denying exemption,
which is now announced, is applied to the national associa-
tions, would work great and manifest injustice. We think,
moreover, that the second proviso is a substantive part of
the act which cannot be disregarded, and that it withholds
from States, whose policy does not allow the organization
of banks and provide for the taxation of shares, the author-
ity to tax the shares of the national banking associations.

It is hardly necessary to add, that we agree that the judg-
ments of the Court of Appeals, in the three cases before us,
must be reversed. But we think they should be reversed
on the ground that the taxation of New York is repugnant
to the first proviso as well as to the second.

JUDGMENT REVERSED, and the case remitted to the Court
of Appeals of the State of New York, with directions to
enter judgment for the plaintiffs in error, with costs.