## FIRST NAT. BANK OF KIOWA v. MEE.

No. 17378.  Opinion Filed Sept. 13, 1927.

(Syllabus.)

**1. Banks and Banking—National Banks—Power to Deal in Government Securities.**

By virtue of section 24, "Title 12," U. S. C. 1926, 44 Stat. 258, defining the corporate powers of national banks, under the language, "To exercise by its board of directors, or duly authorized officers or agents, subject to law, all such incidental powers as shall be necessary to carry on the business of banking; by discounting and negotiating promissory notes, drafts, bills of exchange, and other evidences of debt," and the policy of the government as expressed in the National Banking Laws and as declared by the Supreme Court of the United States, a national bank has the authority to deal in securities of the national government as a part of its business of banking.

**2. Same—Authority of Cashier—Liability of Bank for Acts of Cashier—Sale of Stolen Bond.**

The cashier of a national bank is an executive officer, and is presumed to have all the authority he exercises in dealing with executive functions legally within the power of the bank, and in transactions within the scope of his authority he acts in a representative capacity. In such case, where a transaction is a sale of a stolen bond by a draft drawn to the bank signed by the cashier with the bond indorsed in blank and attested by the cashier attached to the draft, though the cashier's interest therein is adverse to the bank and the bank receives no benefit therefrom, the bank is liable for the amount of the purchase price to the purchaser without notice of any defect or irregularity in the transaction.

**3. Same—Notice to Cashier, Notice to Bank.**

In any transaction legally within the powers of a national bank, knowledge acquired by the cashier respecting any matter affecting such a transaction, though this be not in fact imparted to any other executive officer of the bank, such knowledge is in law the knowledge of the bank.

Commissioners' Opinion, Division No. 1.

Error from District Court, Oklahoma County; Sam Hooker, Judge.

Action by Robert Mee against the First National Bank of Kiowa, Okla., for $505, as for damages upon contract. Judgment for plaintiff, and defendant appeals. Affirmed.

A. N. Beets and O. K. Wetzel, for plaintiff in error

Roscoe Bell and H. A. Wilkinson, for defendant in error.

TEHEE, C. Robert Mee, plaintiff below, hereinafter so designated, on July 13, 1923, filed this action against the First National Bank of Kiowa, defendant below, and hereinafter designated as the defendant bank, for the recovery of $505, which plaintiff alleged he had paid to the defendant bank, as the purchase price of a Liberty Bond.

In his petition plaintiff alleged that he was a dealer in government securities; that the defendant bank was engaged in the general banking business under the National Banking Laws of the United States; that on July 25, 1922, the defendant bank sold to plaintiff a certain registered United States government bond in the denomination of $500, and drew in due course on the plaintiff, by draft with the bond attached, through the American National Bank of Oklahoma City, for the sum of $505, the market value and the agreed price of said bond; that the draft was made in the name of the defendant bank and signed by E. E. Knack, its cashier; that the bond originally was issued to one Charley J. Conrady, and bore the assignment of Conrady in the place in the form provided on said bond, which was attested by the cashier of the defendant bank with the seal of the bank affixed; that on July 27, 1922, upon inspection of the draft and the bond thereto attached and the transaction appearing to be regular, the plaintiff paid the draft; that on said 27th day of July, plaintiff transmitted said bond to the National Treasury Department for conversion into coupon bonds, whereupon he was informed by the department that the instrument was a stolen bond with the signature of the owner, Conrady, forged thereto, and they refused to honor plaintiff's request and retained the bond.

Plaintiff further alleged, under this information, that the assignment was a forgery; that the bond had been stolen, and that the defendant bank was not the lawful owner thereof, of all of which facts the defendant bank had knowledge at the time of the purchase of the bond by plaintiff, and for these reasons the consideration therefor had failed, and prayed for judgment in said sum of $505, with interest at 6 per cent. from July 25, 1922.

Defendant bank denied the allegations of the petition, and further answered that, if the bond in question was sold to plaintiff, it was not the owner of the bond or had any interest in the transaction, nor received any benefit therefrom, and that the acts of its cashier were thus unlawful, fraudulent, and void, and beyond his authority as cashier, and that the defendant bank was without authority to deal in Liberty Bonds, of which facts plaintiff by the papers in the transaction was informed at the time thereof, and that the inspection of the draft and the bond purchased was sufficient to and did give knowledge to the plaintiff of these facts; that the bond was not its property, and that the defendant had no knowledge of the transaction, which was made without its authority, and it has not ratified the act of its cashier, for which reasons it prayed to be relieved from liability in the premises.

On September 3, 1925, the cause was tried to the court without the intervention of a jury. Plaintiff's evidence substantially disclosed the transaction as alleged, except that other officers of the defendant bank had not been actually informed of the transaction; that plaintiff had been engaged in the bond business for a long time, and had made many purchases of government securities in like manner; that generally there were no prior negotiations, and that sales were made to him in numbers of cases upon his card market quotations of government securities which he mailed to all banks in the state; that it was the custom to buy bonds assigned in blank, and in that form forwarded to the Treasury Department for conversion into coupon bonds; that the rules of the National Treasury Department with reference to transfer of registered Liberty Bonds provided that the assignment may be made in blank; that where bonds are received thus indorsed the Treasury Department in completion of the transaction filled in the blank space in the assignment with the indorsement, "Secretary of the Treasury for Exchange into Coupon Bonds"; that the rules further provided that bonds signed in blank, or bearing assignment for exchange into coupon bonds which do not restrict, are in effect payable to bearer and pass by delivery without further assignment; that the cashier of a national bank is authorized to attest assignments, and contains specific provisions that "neither the assignor nor as-

signee, upon the assignment of a registered Liberty Bond, should act as attesting officer, nor should the officer of a bank who executes an assignment in the bank's name, attest such assignment", and that where such officer attests an assignment, the seal of the bank must be affixed; that the plaintiff was without notice of any defect or irregularity in the transaction; that the cashier subsequently was charged with the theft of the bond involved, and was sentenced to the penitentiary for the offense.

Defendant's evidence supported its contentions and clearly disclosed that its cashier had perpetrated a fraud upon it, except it did not show that plaintiff had any knowledge of the criminal character of the transaction.

Upon the introduction of the evidence, the court continued the cause, and concluding the hearing on October 29, 1925, found the issues for the plaintiff, and rendered judgment against the defendant bank in the sum of $603.45. Of this judgment defendant bank now complains, as we gather from defendant's brief, on the theory that: First, it is not liable for the acts of its cashier, as it had no power to deal in government securities; second, that its cashier was not acting within the scope of his duties and authority as an executive officer, and that the face of the transaction disclosed that it was acting merely as a collecting agent; and, third, that it had no knowledge of the fraudulent character of the transaction, and that its cashier's interest therein being adverse, it is not liable. These contentions being related in character will be considered together.

It is, of course, well established that a national bank "can exercise only the powers expressly granted by federal statutes, and such incidental powers as are necessary to the conduct of the business for which they are established." First National Bank v. Missouri, 263 U. S. 640, 44 S. C. 213, 68 L. Ed. 486. Among other things, under its corporate powers, a national bank has the authority "to exercise by its board of directors, or duly authorized officers or agents, subject to law, all such incidental powers as shall be necessary to carry on the business of banking; by discounting and negotiating promissory notes, drafts, bills of exchange, and other evidences of debt." "Title 12," Banks and Banking, chapter 2, section 24, U. S. C. 1926, 44 Stat. 258. By the same section, in addition to other officers, a cashier is provided for with his duties to be defined by the board of di-

rectors. By other sections of title 12, the cashier is recognized as one of the chief executive officers of the bank, as he or the president must attest the statement of all facts upon which the Comptroller of the Currency must determine whether the bank is lawfully entitled to commence the business of banking; that he must sign the circulating notes of the bank; that he or the president must verify the reports of the condition of the bank from time to time made to the Comptroller of the Currency; that he or other officers must assign government bonds for transfer to the Treasury Department to secure the redemption of circulating notes of the bank; and that he or the president must sign the notice of intention to dissolve the corporation.

It is also, by other provisions of law, provided that a national bank shall invest a certain percentage of its capital stock in government bonds for deposit with the Treasurer of the United States to secure the circulating notes of the bank known in our commercial life as national bank currency, which notes are by law made legal tender for all purposes except in the payment of duties on imports, interest on the public debt, and in redemption of the national currency. In addressing itself to the purposes of the National Banking Laws, in a case involving state taxation of national banks, our highest national court used this language:

"In organizing these banks under this act it is made the duty of the association to deliver to the Treasurer of the United States, registered bonds bearing interest to an amount not less than $30,000, nor less than one-third of the capital stock paid in; which bonds shall be deposited with the Treasurer and by him safely kept, etc. This provision fixes the minimum limit of the amount of the bonds to be deposited with the Treasurer, but no maximum is fixed, and the whole amount of the capital may be invested in them. On the deposit of these bonds with the Treasurer, the association is entitled to receive from the Comptroller of the Currency circulating notes of different denominations, registered and countersigned, equal in amount to 90 per cent. of the current market value of the bonds so deposited." Bank Tax Cases, 70 U. S. 573 (3 Wall.) 18 L. Ed. 229.

By later acts the law was amended so that the circulating notes of the bank may equal the par value of bonds thus purchased and deposited. In this case, the court further said:

"These notes, after being signed by the president and cashier, are authorized to

be issued and to circulate as money, and are to be received at par in all parts of the United States in payment of taxes, excises, public lands, and all other dues to the United States except for duties on imports; also for all salaries and other debts and demands owing by the United States, except interest on the public debt and in redemption of the national currency.

"These associations also possess all the powers necessary for carrying on the business of banking by discounting and negotiating promissory notes, drafts, bills of exchange, and other evidences of debt; by receiving deposits, and selling exchange, coin and bullion, by loaning money on personal security; by obtaining, issuing and circulating notes according to the provisions of this act, etc. * * *

"They are also made depositories of public moneys when designated by the Secretary of the Treasury, and may be employed as fiscal agents of the government."

. In a later case involving the same subject, and in adverting to the purposes of the National Banking Laws, the same court said:

"The key to the proper interpretation of the Act of Congress is its policy and purpose. The object of the law was to establish a system of national banking institutions, in order to provide a uniform and secure currency for the people, and to facilitate the operations of the Treasury of the United States. The capital of each of the banks in this system was to be furnished entirely by private individuals; but, for the protection of the government and the people, it was required that this capital, so far as it was the security for its circulating notes, should be invested in the bonds of the United States." Mercantile National Bank v. New York, 121 U. S. 138, 7 S. C. 826, 30 L. Ed. 895.

Under the quoted statutory language defining the powers of national banks and the policy of the government as expressed in the National Banking Laws, and as judicially declared by the foregoing cases, it may well be said that a national bank may legally deal in the securities of the national government as a part of the business of banking. No case has been called to our attention by counsel wherein the authority of a national bank to deal in such securities has been challenged in the federal courts. In a recent case, wherein a transaction similar to the case at bar, involving several thousand dollars, was considered, the right to thus deal was clearly recognized. Kean v. National City Bank. 294 Fed. 214.

Wherever the authority of a national bank to deal in national securities has been challenged in state courts, the power has been sustained. Caldwell v. National Mohawk Valley Bank, 64 Barb. (N. Y.) 333; Van Leuven v. First National Bank, 54 N. Y. 671; Yerkes v. National Bank, 69 N. Y. 382, 25 Am. Rep. 208; Leach v. Hale, 31 Iowa, 69.

In Caldwell v. National Mohawk Valley Bank, supra, there was also involved a transaction in many respects similar to the one now in hand, and where like questions were raised. Upon the questions of the authority of the bank to deal in government securities, and the liability of the bank for acts of its cashier, the court used this language:

"It is now insisted by the defendant that the purchase of bonds by the bank for its customers was not a legitimate business, and that it was not permitted by the articles of association, or the laws of the state, or of Congress. It is not denied that the practice was highly meritorious and of great benefit to the United States Treasury. One of the objects of the creation of the national banks was to aid the United States Treasury, in borrowing money on the credit of United States bonds; and all the banks of the state, with hardly an exception, became the voluntary agents of the government in procuring loans, in this manner. They solicited and received the money of individuals and invested them in United States bonds. This was of course done through the cashier as the financial officer of the bank, and it enabled the banks to handle the funds and greatly enlarge their operations.

"It is made a question whether this was a legitimate business for the bank to engage in. As a general rule, a corporation is not bound by the acts of its agents. unless they come within the general powers conferred upon it by its charter. There may be exceptions, where it appears that the corporation has had the benefit of the deposit, and cannot, in justice, return such benefit; but here the defendant offers to show that the bonds were converted by the cashier to his own use, and were never applied to the use of the bank. In such a case, it will hardly be contended that the bank is liable, if the contract is one which the bank was forbidden to make.

"But the banks have so long been engaged in acting as agents of the United States Treasury in the business of investing their own, as well as their customers' money in United States bonds, without any objections from the directors or stockholders, and with the sanction of the general government, too, that it would be wrong for the courts to pronounce the business ultra vires and illegal, without the most satisfactory reasons for adopting such a

conclusion. I see no good reason why the courts should condemn a transaction which has so many sanctions to uphold it; and I think the tendency of modern decisions is, to hold banks responsible for all contracts which are not forbidden by their charters or some positive statute; especially in favor of those who are not supposed to be acquainted with the limitations of their powers. Certainly there was nothing illegal in the transaction complained of, or against public policy."

This court takes judicial notice of the fact that in our recent political history many sales of Liberty Bonds were made through the national banks to our citizenry in aid of the national government. It may therefore be regarded as well established that a national bank is authorized and has the power to deal in securities of the national government as was done in the case at bar, and therefore the defendant's liability is fixed unless it may be determined that its cashier was acting beyond the scope of his authority, in the transaction involved, wherein he had an adverse interest.

It may now be regarded as elementary, as a general proposition, that a bank is liable for the acts of its officers "while engaged in the business of their employment in the same manner and to the same extent that individuals are liable under like circumstances," and it is said that "the rule proceeds upon the consideration that the author of the misfortune shall not himself escape the consequences and cast the burden upon another." Merchants' National Bank v. State National Bank, 77 U. S. .(10 Wall.) 604, 19 L. Ed. 1108.

Under said "Title 12," the cashier of a national bank clearly is an executive officer. We are not informed by the record what his duties, in addition to those fixed by statute, may have been in the case at bar. Generally, the by-laws of the corporation, whereunder his duties are further defined, require that all contracts, checks, drafts, receipts, and the like shall be signed by either the cashier or other officers, and fix his responsibility for the monies, funds and other valuables of the bank, and that he shall give bond for the faithful performance of the duties required of him. By virtue of his position he is held out to the public as being a person in whom great confidence may be reposed, and that the public may deal with him with safety and security.

In the case at bar there is nothing on the face of the transaction to indicate that his authority as an executive officer of the defendant bank was limited by the board of directors to that extent, where he would not be authorized to handle the transaction involved. In Merchants' National Bank v. State National Bank, supra, the court addressing itself to the relation of the cashier to a national bank, wherein was involved the liability of the bank for certification of checks by its cashier, said:

"The cashier is the executive officer through whom the whole financial operations of the bank are conducted. He receives and pays out its moneys, collects and pays its debts, and receives and transfers its commercial securities. Tellers and other subordinate officers may be appointed, but they are under his direction, and are, as it were, the arms by which designated portions of his various functions are discharged. A teller may be clothed with the power to certify checks, but this in itself would not affect the right of the cashier to do the same thing. The directors may limit his authority as they deem proper, but this would not affect those to whom the limitation was unknown. * * *

"Those dealing with a bank in good faith have a right to presume integrity on the part of its officers, when acting within the apparent sphere of their duties, and the bank is bound accordingly."

This principle of law, as laid down in the foregoing case, has been applied many times in both state and federal courts in cases wherein was involved the liability of national banks for the acts of the cashier or other executive officers in many phases of their powers and duties, so that it may now be regarded as the established law of the land. Carlisle First National Bank v. Graham, 100 U. S. .699, 25 L. Ed. 750; Magee, Banks and Banking (3rd Ed.) 192, and numerous other authorities there cited.

The transaction here involved was a simple one. The draft was drawn in the name of the bank and signed by its cashier with the bond thereto attached. With the assignment executed in blank, the bond, under section 7704, C. O. S. 1921, and the rules of the National Treasury Department, was transferable by delivery without further assignment. The price paid for the bond was above par. There was nothing on the face of the transaction to indicate any defect or irregularity therein, and it was in the form customarily handled by plaintiff in his business, and, under its evidence, by the defendant bank itself for its customers. In every respect the transaction appeared to be regular. The defendant bank had the power to engage in such a transaction; its cashier was an executive officer, and though

his interest in the transaction was adverse to the defendant bank, of this personal interest the plaintiff was without notice. In these circumstances, therefore, the trial court properly held that on the face of the transaction the cashier was acting within the scope of his authority.

The fact that the defendant bank was not informed by its cashier of the status of the bond involved, in the circumstances of this case, does not relieve it of liability to plaintiff for the perfidy of its cashier in the given transaction. It is a too familiar doctrine to require argument in support thereof, that any information obtained by an agent respecting any matter coming within the scope of his authority, though knowledge thereof be not in fact imparted to his principal, is nevertheless the information or knowledge of the principal. This is grounded on the theory of the honesty of mankind, and that in the contractual relationship in employments, the employee will communicate all information to his employer acquired by him respecting any matter within the purview of the business in which he is employed. It is opposed, and properly so, to even the suggestion that there might be any criminal tendencies in man, for all men are presumed to be honest. In this case, therefore, the cashier having received the bond involved with the knowledge that it was not rightfully acquired, and thereupon having wrongfully transferred the bond by sale thereof to plaintiff as a bank transaction, his knowledge must be considered as the knowledge of the defendant bank, as by virtue of his trust relationship it was his duty to thus communicate this information. Notice to its cashier that the bond was stolen property was notice to the defendant bank, and his act in relation to the transaction was sufficient to bind the defendant bank and fix its liability. Duncan v. Jaudon, 82 U. S. 165, 21 L. Ed. 142; National Bank v. Stever, 169 Pa. St. 574, 32 Atl. 603; Hewitt v. First National Bank, 113 Tex. 100, 252 S. W. 161; Grossfield v. First National Bank, 73 Mont. 219, 236 Pac. 250; Merchants' National Bank v. Tracy, 29 N. Y. 77. For a general application of the rule, see Magee, Banks and Banking (3rd Ed.) 196. And this is the true principle though the defendant bank did not profit by the transaction. Kean v. National City Bank, supra; Williams v. People's Bank, 188 N. C. 197, 124 S. E. 125.

Knack was the cashier of the defendant bank, and as such, as shown by the papers in the transaction, had approached the plaintiff. Upon his act, which on the face of the transaction was for the defendant bank, plaintiff parted with his property. To borrow language from Merchants' National Bank v. State National Bank:

"The misfortune occurred through him. and as the case appears in the record, upon the plainest principles of justice, the loss should fall upon the defendant. The ethics and the law of the case alike require this result."

Accordingly, the judgment of the district court is affirmed.

BENNETT, REID, LEACH, and FOSTER, Commissioners concur.

By the Court: It is so ordered.

Note.—See under (1) 7 C. J. p. 808, §729. (2) 7 C. J. p. 786, §657. (3) 7 C. J. pp. 530, 531, §134; 3 R. C. L. p. 476; 1 R. C. L. Supp. p. 834; 6 R. C. L. Supp. p. 181