FIRST NAT. BANK OF TOLEDO and others *v.* TREASURER OF LUCAS CO.

*(Circuit Court, N. D. Ohio, W. D.* December Term, 1885.)

1. TAXATION—NATIONAL BANKS—UNLAWFUL DISCRIMINATION—REVISED STATUTES OF THE UNITED STATES, § 5219.

Where the taxing officials of a city or county, which is, under the laws of the state, the territorial unit of locality for the taxation of personal property, by agreement among themselves, without formal resolution to that effect, reach a "*tacit understanding*" that they will assess all personal property at six-tenths of its actual value, and do this, but the national banks there located are assessed at a larger per centum of the actual value of their shares, the collection of the excess will be restrained; and this, although the excess is imposed by a state board of equalization in its attempts to equalize the national banks among themselves throughout the state, or to equalize all "incorporated banks," state and national.

2. SAME SUBJECT—STANDARD OF COMPARISON IN THE MATTER OF DISCRIMINATION.

The act of congress which protects national banks from injurious discriminations does not limit the standard of comparison to the "moneyed capital"

invested in the *"incorporated banks"* of a state, but extends to all "moneyed capital in the hands of individual citizens of the state." To equalize the shares of national banks as to a part only of that moneyed capital, is not to equalize them as to the whole, which is necessary to comply with the statute.

3. SAME SUBJECT—STATE BOARD OF EQUALIZATION.
  Where the state board of equalization for the "incorporated banks" of the state attempts to equalize the national banks in one class *inter sese*, and the state banks in a separate class *inter sese*, but adopts one standard of percentages for the state banks and another standard for the national banks, upon the same basis of principal sums for calculation as to each class, and maintains the average of one class at a different figure from the average of the other, if the result be an assessment of the national banks at a higher valuation, comparatively, than the others, this is evidence, in a general way, of a discrimination that is unlawful, and if it produces, as to the plaintiffs, an injurious discrimination, by assessing their shares at a valuation higher than other moneyed capital in the county or city where they are located, the excessive taxation will be restrained.

4. SAME SUBJECT—ASSESSMENT BELOW VALUE IN MONEY.
  Nor is it any less an unlawful discrimination that the national bank shares are in fact assessed *below* "their true value in money."

In Equity.

These are five bills filed by the national banks located at Toledo, Ohio, to restrain the collection by the tax collector of an alleged excess of taxation, they having paid that which they admit to be due. The facts are stated in the opinion of the court.

*Doyle & Scott,* for plaintiffs.

*E. S. Dodd* and *G. Harmon,* for defendants.

Before WELKER and HAMMOND, JJ.

HAMMOND, J. The question presented by these cases is one of fact rather than law. The complainants contend that they fall within the principle of *Cummings* v. *National Bank,* 101 U. S. 153, and *Pelton* v. *National Bank,* Id. 143, while the respondent seeks to bring them within the rulings of *Exchange Nat. Bank* v. *Miller,* 19 Fed. Rep. 372, and *Wagoner* v. *Loomis,* 37 Ohio St. 571. It is better, however, before we consider the question of fact, to examine the precise bearings of these adjudications upon the rights of the parties here. They sufficiently set forth the various provisions of the constitution and laws of Ohio, and the peculiar methods of taxation in that state, and make it wholly unnecessary to repeat them in this connection. I understand the supreme court of Ohio to decide that, inasmuch as the constitution and laws of the state provide for equality of taxation by requiring all property whatever to be assessed for taxation at its "true value in money," any citizen whose property is assessed below that value has no just cause of complaint because the property of other citizens is assessed at less than his own, and his only remedy is to apply to the assessing officers to increase all assessments to their "true value in money." This is the constitutional test of equality, and, even where there is a fraudulent conspiracy to discriminate against a citizen or a class of citizens, there is no relief, unless it can be shown that the burden imposed is greater than it would have

been if all assessments had been made at "their true value in money."

While the supreme court of the United States has not undertaken to decide that this is not a correct interpretation of the constitution and laws of Ohio, it does decide that national banks can only be taxed by the states to the extent permitted by congress, and that existing legislation does not permit the state of Ohio, by direct statutory enactment, or through its taxing officials, to systematically discriminate against those banks, even within the limit of the true value of their shares in money. Whatever may be the legal test of equality under the constitution and laws of Ohio, the test prescribed by the act of congress is that national banks shall not be taxed in excess of other moneyed capital. Rev. St. 5219. In the *Pelton Case* it was not complained that the taxation of the bank was greater than its true value in money, but only that, "while all the personal property in Cleveland, including moneyed capital not invested in banks, was in the assessment valued far below its real worth, say at one-half or less, the shares of the banks, after deducting the real estate of the banks separately taxed, were assessed *at their full value, or very near it.*" So, in the *Cummings Case* the complaint was based on conduct of the taxing officials similar, if not identical, in all respects to that complained of in the case we are considering. There was no pretense that the shares were taxed beyond their true value in money, but only that other property being taxed 'at six-tenths of its value, the bank shares were assessed at a sum "fully *equal to* the selling prices of said shares and to their true value in money." The disproportion was the thing complained of and relieved against in both cases. There is nothing in the case of *National Bank* v. *Kimball,* 103 U. S. 732, which modifies in the least the two others we have cited. On the contrary, the rule is repeated that "where, though the law itself is unobjectionable, the officers who are appointed to make assessments combine together and establish a rule or principle of valuation, the necessary result of which is to tax one species of property higher than others, and *higher than the average rate,* the court will also give relief," as it will when the statute itself makes the injurious discrimination.

And here it may be remarked that the principle is finding extension in its application, that federal prohibitions against the states cannot be evaded by making laws fair upon their face, and yet, in their administration, through common consent or neglect to enforce them, operating to annul the federal restriction. *Virginia Coupon Cases,* 114 U. S. 269, 307; S. C. 5 Sup. Ct. Rep. 903, 923. The supreme courts of the United States and of the state of Ohio agree that, if the constitution and laws of Ohio be obeyed, or obedience to them be enforced, no inequality of taxation can arise, except such as is incidental to the exercise of erroneous judgment in valuation; or, to use the apt and forcible language of Judge SAGE in *Exchange Nat. Bank* v. *Miller, supra,* only such that to relieve against it would be to

substitute for "the judgment of the assessors, in their official valuation," the differing judgment of the parties themselves, or their witnesses, "as expressed in their testimony." But when the officials charged with the duty of assessing values deliberately determine, in deference to the popular will, not only to violate the statute itself, but the judicial admonition of those august tribunals, and adopt a different mode of valuation,—as, for example, that they will place all property on the duplicate at a certain percentage of its true value in money,—they cannot be permitted to apply one percentage to other property—especially, "other moneyed capital"—and a *larger* percentage to the shares of national banks, for the simple reason that, whatever the laws of Ohio may permit in this regard, a paramount act of congress forbids it. And there can be no question of intention or design in such discrimination. In the very nature of it, arithmetically considered, there is discrimination in the operation; and no reasonable man can be heard to say that he did not intend to discriminate when he applies a *larger per centum* of valuation in one case than another. If an assessor say, this piece of property is worth $1,000 and this $600, the first tax-payer cannot complain, though each piece be worth precisely the same by every possible rule of value. But when the assessor says, these articles of property are each worth $1,000, or it may be different sums, and I assess one at *six*-tenths, and the other at *seven*-tenths, he designedly discriminates injuriously—the fact that he *ignorantly* does it is immaterial—against the one affected, and he does an entirely different thing than in the first operation mentioned. The supreme court of the United States says that the peculiar taxing system of Ohio, with its various assessors and diverse boards of equalization, does not, necessarily, result in such discrimination; but it has never said that when, in a given assessment, these boards, one and all, or any one of them, adopt a six-tenths rule as to one tax-payer, and a seven-tenths rule as to another tax-payer, there is not necessarily a discrimination in the transaction. It has said just to the contrary, and so has the supreme court of Ohio when it declared that "taxing by a uniform rule requires uniformity, not only in the rate of taxation, but also in the *mode* of assessment upon the taxable valuation." *Exchange Bank* v. *Hines*, 3 Ohio St. 1, 15. A six-tenths mode as to one, and a seven-tenths mode as to another, is not uniformity.

And here it is to be observed, for the fallacy of the contrary rule lies in that direction, that it is wholly immaterial upon what principal sum of value you make these respective calculations of percentages. If it be determined to assess all property at six-tenths of its "true value," or of its "market value," or by whatever name you designate it, and *that* value be reached in one case by taking the par or face value of shares in a bank, let us say, and in another by taking a value higher than the par value, because the shares will sell for more, and on one you calculate six-tenths, and on the other seven-

tenths, the want of uniformity takes place, and results in a discrimination just as much as if the principal sums had been selected in exactly the same way. And it is no argument against the illegality of the discrimination to say that either of these principal sums was improperly taken as the basis of calculation, or that one was too large and the other too small, or that neither is just what it should have been. The vice does not consist of discrimination at that point, but beyond it,—at the point where the different modes of ascertaining the final taxable value are adopted. The "systematic rule" that entitles the party to relief is taking a differing percentage for the final calculation. We do not say that unlawful discriminations may not be made in ascertaining the principal sums on which to calculate the percentage, but that unlawful discriminations are always made whenever the principal sums having been ascertained, no matter how, a different percentage is adopted in ascertaining the amounts to go upon the tax duplicate. Such a mode is just as "systematic" if applied in a single instance as if applied in many, if adopted by one assessor as if adopted by all, and is as "intentional" in its discrimination as if a preconceived purpose had been declared. One who touches a match to the powder might as well say that he did not intend that the powder should explode, as that an assessor should say that under such a rule he did not intend to discriminate. We do not wish to say that inequalities of valuation arrived at by erroneous mathematical calculations come within the rule of equitable relief more than inequalities otherwise reached by the imperfect processes of human judgment, but only that the process to which we have adverted carries upon its face the inherent evidence of a *systematic* rule of assessment that *necessarily* discriminates against the injured tax-payer, and that, on the principle that all must be taken to intend the inevitable consequences of their conduct, such discrimination is *designedly* oppressive. That a court of equity has jurisdiction to relieve against it there can be no doubt. *Boyer* v. *Boyer,* 113 U. S. 690, 695; S. C. 5 Sup. Ct. Rep. 706; *Covington Nat. Bank* v. *Covington,* 21 Fed. Rep. 484; *Stanley* v. *Albany Co.,* 15 Fed. Rep. 483; *National Bank* v. *Farwell,* 7 Fed. Rep. 518. And, to quote: "These decisions show that, in whatever form the question has arisen, this court has steadily kept in view the intention of congress not to permit any substantial discrimination in favor of moneyed capital in the hands of individual citizens as against capital invested in the shares of national banks." 113 U. S. 695; 5 Sup. Ct. Rep. 709. Nor do I understand these cases to imply that there must be "a fraudulent conspiracy" between more than one person engaged in the business to injure the national banks, *eo nomine,* by assessing them at a higher valuation than the average; but only that, whatever be the state of mind of the taxing officials on the subject, and be the assessors one or many, no rule of valuation shall be adopted that lacks the element of uniformity in its application to all alike, if the rule be in-

jurious in its operation by discriminating against the banks under the protection of congress.

Coming now to the facts of this case, let us first examine the action of the state board of equalization. We have in their own report the "rules" by which that action was governed, as follows:

"The state board of equalization of bank shares adopted the following rule for arriving at the valuation of national banks: (1) Take as a basis amount of capital, surplus, and undivided profits, as representing the actual value of the shares. (2) Take the assessed value of the shares as fixed by the county auditors, exclusive of real estate, and ascertain what per cent. it bears to the sum of the capital, surplus, and undivided profits. It was found that the value, as fixed by county auditors, was 68 per cent. of actual value. (3) For the purpose of equalizing, as nearly as possible, the valuations, and allowing a reasonable margin for the judgment of the auditors, the board decided it would determine the value of the shares as follows: In all cases where the per cent. of assessed value to actual value did not exceed 75 per cent., or fall below 65 per cent., it should remain as returned by county auditors. In all cases where such value exceeded 75 per cent., it should be reduced to 75 per cent., but a reduction of more than 10 per cent. should not be made, except in special cases of apparently excessive valuation. In all cases where such value fell below 65 per cent., it should be increased to 65 per cent., but an increase of more than 10 per cent. should not be made, except in special cases where the value fixed by the auditor was deemed excessively low. (4) To the values thus found was to be added the assessed value of real estate. Same rule was used in fixing valuations of state banks as national banks, except that 55 to 65 per cent. was taken as a basis instead of 65 and 75."

Now, passing for a moment all contention as to the circumstances under which it was done, there is no doubt of the fact that the county auditor of Lucas county in the discharge of his function, under the, Revised Statutes of Ohio, § 2766, took precisely the same basis for the "actual value of the shares" that this board did, namely, the par value of the stock, the surplus, and undivided profits, as returned by the respective banks themselves; and he did this uniformly, treating the only state bank in the county in precisely the same way. This was the "judgment of the assessor in his official valuation" of the actual or "true value in money" of all bank shares in the city of Toledo. It were bootless to inquire whether the "unofficial judgment" of witnesses would not have found the true value in money to have been different because these shares, or some of them, could have been converted into money at higher figures; for, both the primary and revising officials appointed to make this assessment *agreed*, by their action, that it should be fixed at the par or face value of the stock, surplus, and profits *as returned by the banks themselves*. Hence we have a uniform basis of the principal sums to start with, and our only inquiry is, have these officers adopted a uniform rule of percentages in fixing the final values for the tax duplicate, or have they adopted rules on that subject which, for want of uniformity, result in producing an inequality that necessarily, from the nature of the rules, discriminates against the national banks, by putting them on the

duplicate at a higher percentage than "other moneyed capital in the hands of individual citizens?"

Unfortunately, we have not, in this record, a tabulated statement showing the action of this board in reference to all the national banks in the state of Ohio, but we have such a statement as to all the state banks. By it there appears the fact that, starting with the same uniform basis of calculation, the average *assessed values*, as fixed by the county auditors, was 59 per cent. of that sum; and when the board had finished with the application of its own rules to each bank according to its deserts, the *average* was the same,—59 per cent.,—but there were remarkable changes in the detailed results, to which reference will be presently made. It appears, by these rules themselves, that the averaged value fixed by the county auditors for *national* banks was 68 per cent., on the same basis of calculation; and, inferentially, when the equalization among them was completed, it was also left at 68 per cent. It would seem, on the rule of percentages, that given a uniform basis of actual values, fixed by adopting those of a statutory rule requiring a uniform report of certain values for both classes of banks, this equalizing process could have been brought about by increasing the state banks—each according to its deserts—to the average of the national banks of 68 per cent.; or reducing the national banks—each according to its deserts—to the average of the state banks of 59 per cent.; or fixing any common per centum, and conforming all alike to that. But the board did not do this, and confined its equalization to each class separately. The act of congress having forbidden the greater taxation of national banks than state banks, or other moneyed capital of individual citizens, it would seem that this board of assessors,—for that is what they were,—in obedience to it, should have had a care to equalize the national banks with the state banks, and not alone each class separately, *inter sese.* Here was, according to this tabulated statement of its action in the matter of the state banks, an aggregated "moneyed capital" of $2,159,-491.04, in the hands of the state banks of Ohio, which they assessed at an average of 59 per cent. of *that amount,* being its par value as returned by the banks in obedience to a statute prescribing the method of making the return. Presumably, the amount returned by the national banks was not less, perhaps was largely more; and that was assessed, confessedly, at an average of 68 per cent. of the same par value returned in obedience to the same statute. This was a discrimination of 9 per cent. against the national banks as a whole without reference to its effect on the individual cases of either class. Moreover, the board adopted a sliding scale of increase and decrease differing 10 per cent. between national and state banks, which certainly did not tend to mitigate the discrimination already shown by the larger average of the returns made by the auditors.

Taking the largest average of local valuation among the state banks, we find that a bank in Ashtabula county was assessed at 93 per cent.

of the statutory return values, and was reduced to 83 per cent. by this board, being 24 per cent. above the average; and the lowest, a bank in Monroe county, by local valuation was placed at 16 per cent., and by state valuation was increased to 26 per cent., being 33 per cent. below the average, and a difference of 57 per cent. between the two banks upon their statutory returns. If the same process was applied to the national bank class, as doubtless it was, here would be discrimination against the bank taxed at the higher average in favor of the "moneyed capital" of the individual citizens owning the other national bank; and it is just as much against the act of congress to discriminate in favor of one national bank as against another national bank as it is to discriminate in favor of other citizens. The effect of all this on individual banks it is impossible to tell; but it shows, as evidence, that there was a discrimination against the national banks as a class in favor of the state banks as a class, and against the national banks *inter sese*, in some instances, certainly. Again, in direct violation of the state statute, (Rev. St. Ohio, § 2766,) this board, after fixing the "assessed value of shares, exclusive of real estate," instead of placing *that* value on the duplicate, which would be deducting the real estate as it stood upon the duplicate, *added* the value of the real estate to the other. Why this was done is not at all explained, and it was done as to both national and state banks. Perhaps they found that, under their manipulation of the returns, in some cases, as in that of the only state bank in Toledo, the value of the shares was such that to deduct the real estate left nothing for taxation. In that instance they found the value of the shares $35,031; and, as the value of the real estate had been already fixed on the duplicate at $37,530, to deduct it would allow the bank to escape all taxation on its shares. This was not an absurd result, under the particular mode of assessment adopted, and should not have deterred the board from obeying the statute, because it might frequently happen, under such a plan of assessing values, that a bank's real estate would exceed in value the value of its other resources, or its shares of stock, however that value may have been fixed. But the direction of the statute is plain that the real estate must be deducted from whatever value is found as the actual value, and that this value, exclusive of real estate, should go on the duplicate. This could not happen, however, under the correct statutory system of valuation pointed out by the supreme court of Ohio, when the value of the real estate would properly enter into the estimate of the total value of the shares of the bank, as primarily ascertained under the preceding section, unless the real estate, after paying the debts, should be all that was left. The technical meaning of *a share* of stock in a partnership or incorporated company is that portion of the surplus which belongs, under the articles of agreement or charter and by-laws, to the members according to their respective interest, after the property, real, personal, and mixed, has been converted into money, and the debts paid. Estimating the mar-

ket or "true value in money" for the purposes of taxation is, *pro hac vice*, a conversion into money. And this is true, notwithstanding there may be a value beyond this arising, while the concern is in business, out of the good-will, or out of the franchise granted, which may or may not be taxable according to circumstances, and whatever latitude be allowed for diverse schemes of taxation, or whatever constitutional or statutory restrictions be imposed on any particular scheme. *Bank of Commerce* v. *New York City*, 2 Black, 620; *Van Allen* v. *Assessors*, 3 Wall. 573; *Farrington* v. *Tennessee*, 95 U. S. 679, 686; *Delaware Tax Case*, 18 Wall. 206, 229; *Frazer* v. *Seibern*, 16 Ohio St. 615, 619, 620. The effect of the wrong plan on this Toledo state bank was to assess it at very near the face value of its returns for taxation, or about 96 per cent. Of course, we have nothing to do with this particular inequality, but it illustrates that the inequalities were "gross, if not scandalous," to use the phrase of the chief justice of Ohio. The system is essentially vicious, and necessarily results in discriminations *as applied in this particular assessment,* though not necessarily in all assessments; for, as the supreme court of the United States says in the cases cited, it may be that it is possible to so work it that no discrimination will take place in fact against any given national bank. Certainly, the conspicuous and intelligent officials constituting this state board of equalization understood, as we do, that inequalities and discriminations were the necessary outcome of their "rules;" and they found their justification, no doubt, and not unnaturally, in the decision of the state supreme court that, as long as they kept below the *"true value in money"* in all cases, there was no violation of the constitution and laws of the state of Ohio, and discriminations were immaterial. But they certainly overlooked the act of congress as interpreted by the supreme court of the United States. For, although their action in the premises did not necessarily, nor in fact, result in taxing any national bank at a valuation higher than its true value in money, as shown by the bank's own return, or, perhaps, not higher than its true value in money, as shown by the selling prices in the market, it did result, as we can see in a general way, if we take the state of Ohio as the unit of locality, in assessing the national banks, on the average, higher than the "other moneyed capital" invested in state banks.

Counsel for complainants attack this report vigorously as inherently void on its face, because of the violations of the statute we have mentioned, and insist that any increase arising from it should be enjoined as illegal. Not being in violation of the Ohio rule of equality by going above the true value in money, we cannot assent to this, nor say that it is void; but, under the federal or congressional rule of equality, we do think that, systematically, the national banks have been, by this action of the board of equalization, designedly assessed at a relatively higher value than other moneyed capital in state banks. The "rules" were discriminating within themselves, according to that

test, and each of the complainants here shows that it was assessed at a valuation higher than the average applied to state banks, and therefore suffered by the discrimination in this general way.

But, when we apply still another test of equality, the discrimination becomes more glaring. Under the Ohio system of taxation, the state is not the unit of territorial locality for the valuation of all "moneyed capital in the hands of individual citizens" of that state. It is the unit for real estate and for *incorporated* banks; but for that vast field of investment of "moneyed capital" not employed by *incorporated* banks, the counties and cities are the units of locality, and it is there that equalization takes place, and not throughout the state. But the act of congress does not at all limit the standard of comparison to "moneyed capital" invested in the *incorporated* banks of Ohio, but extends it to all "moneyed capital in the hands of individual citizens" of that state. Hence we must look also to the counties and cities, and examine the allegations of these bills as to discriminations according to that comparison. There is no doubt of the fact, however it may have occurred, that in Lucas county all personal property was placed, or intended to be placed, upon the duplicate by the taxing officials at six-tenths of its value. So thoroughly was the rule carried out that money, about the value of which there was no room for any differing "official judgment" as to its value, was placed at six-tenths, like the rest. The auditor, who was the primary assessor of bank shares, impartially assessed all shares at six-tenths of the value as shown by their own returns, and deducted the real estate as required by statute. But the equalizing board, whose action we have been examining, disturbed this assessment by increasing the values of the complainants here about as follows:

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| First National Bank, | - | - | - | - | - | - | 70 per cent. |
| Second    "    " | - | - | - | - | - | - | 66 "    " |
| Toledo    "    " | - | - | - | - | - | - | 70 "    " |
| Merchants' "    " | - | - | - | - | - | - | 68 "    " |
| Northern  "    " | - | - | - | - | - | - | 65 "    " |

The auditor, however, took the responsibility of violating the instructions of the state board of equalization, and did not *add* the values of the real estate, but placed the complainants on the duplicate at the increase of that board of "assessed value, exclusive of real estate," not *deducting* the real estate from those values. The result was they went upon the duplicate at something less than the foregoing figures, but all in excess of the six-tenths of other property. The defense against this is, as before, that these officials, one and all, were charged with the duty of assessing complainants at the true value in money of their shares; and, being *below* that value, by whatever imperfect processes they may have arrived at the figures, there can be no complaint that other property has been assessed at less than their own. What we have already said is an answer to this, because the six-tenths valuation was "a rule" so inherently uniform

in its application that to increase the per centum was, *ipso facto*, to discriminate injuriously.

But there was a "system" in it beyond that, if anything more be needed. There is conflict in the proof as to the fact whether the assessment at six-tenths was the result of formal action by the taxing officials, but none that there was a general understanding to that effect. It was not the result of accident, as is plainly shown by the proof. We shall not undertake to detail the testimony, but only to say that it establishes, we think, these facts.

(1) Prior to the year in controversy the taxing officials of Lucas county and the city of Toledo determined by formal resolution that, inasmuch as the decennial assessment of real estate in 1850 had fixed the taxable value of that class of property at about one-half its value, it was only fair to assess personal property at six-tenths, as nearly as could be done. (2) In 1883 the local board of equalization determined, in consultation, to assess it in the same way; but, objection being made that perhaps there was no power or was danger in taking a formal resolution to that effect, they agreed to let the action rest in a "mutual understanding" to so assess it, and without such formal action. Some witnesses say a motion was put and carried, but this was, perhaps, not quite correct; and the matter was left to a mere "understanding" among the members that they would direct the auditor to so instruct the local assessors, and when it came to equalization they would themselves act on that "understanding." (3) When the assessors assembled under the call of the auditor, pursuant to section 2749, Rev. St. Ohio, some witnesses say he gave them the instruction to assess at six-tenths,—he says he did not, and we think that he is the most accurate; and that, while he and they agreed that it should be so assessed, to make all property equal in taxation, he declined to so instruct them, but referred them to the laws of Ohio for their duty. (4) Nevertheless, the assessors themselves determined to assess at six-tenths, and, again, some witnesses say that a motion was made and carried, but it was not to be made a matter of record; but we think this is not, perhaps, quite accurate, but they did "mutually agree" that they would so assess the property, and without such formal action. (5) The county auditor, yielding to the popular will in that behalf, himself determined to so assess the banking capital within his jurisdiction. (6) The assessors did assess all personal property at six-tenths, as nearly as could be; the board of equalization corrected all assessments according to their mutual understanding, and equalized the returns in pursuance of that simple mathematical process; and the auditor did the same for the banks. (7) Thus, all personal property, except the "moneyed capital" employed in the *incorporated* banks, went upon the tax duplicate at six-tenths, without more ado, and the returns of the banks were made to the state board of equalization, with the results already mentioned.

It needs only a statement of the facts to show that this action of

the taxing officials was as effectual to invoke the operation of the legal principles we have referred to as if their action had been of the most formal character and made a matter of record; as effectual, indeed, as if the "usage," "custom," "agreement," "mutual understanding," "tacit consent," etc.,—by all of which names it is called by the witnesses,—had been embodied in a statute of the state of Ohio. The evasion attempted cannot be permitted. The method adopted was a "systematic rule" of assessment that should have been applied, and was, by the local assessors to all alike; and any departure from it would amount to an illegal discrimination. Now, then, even if it be admitted that the state board of equalization had, throughout the state, exactly equalized all "moneyed capital" invested in the "incorporated banks," state and national, and yet there was a discrimination against the national banks located in Lucas county or the city of Toledo in favor of "other moneyed capital in the hands of individual citizens," and this discrimination was the result of a "systematic rule," necessarily producing the discrimination, it would be unlawful and should be restrained; and this, for the plain reason that, whatever be the test of inequality under the laws of Ohio, the act of congress has not said that the standard of comparison for the discrimination prohibited, shall be confined to the moneyed capital invested in the incorporated banks of the state of Ohio, but extends to all "moneyed capital in the hands of individual citizens" of that state. To equalize the national banks with a part only of the "other moneyed capital" is not to equalize them with the whole, which is necessary to comply with the act.

Let the complainants have decrees restraining the collection of the excess of taxation levied upon them, they having paid all that they admit to be due. If the parties cannot agree upon the amounts of the excess, there should be a reference to the master to settle it. So ordered.

WELKER, J., concurred.