(29 Misc. Rep. 59.)

PEOPLE ex rel. JENKINS et al. v. NEFF et al.

(Supreme Court, Special Term, Kings County. September, 1899.)

1. TAXATION—BANK STOCK—MODE OF ASSESSMENT.

Under Tax Law (Laws 1896, c. 908) § 12, providing that capital stock shall be assessed at its actual value after deducting the assessed value of the realty, and section 24, providing that in assessing bank stock there shall be deducted from its value such proportionate sum as the assessed value of the realty bears to the value of the shares, in determining the value of the shares of national bank stock the assessed value of the realty, and not the actual value, is to be deducted from the value of the shares.

2. SAME.

In determining the value of the assets, the realty shall be taken at its actual value.

3. SAME—TRUST COMPANIES.

Though Laws 1893, c. 696, permits trust companies to charge interest in advance, and puts them on an equality with banks as regards interest and usury, yet this does not bring them into competition with national banks, within Rev. St. U. S. § 5219, authorizing a state to tax shares of national banks, but not at a greater rate than assessments on the moneyed capital in the hands of individuals.

4. SAME—DISCRIMINATION.

Tax Law (Laws 1896, c. 908) § 24, provides that in assessing bank stock each stockholder shall be allowed all the deductions and exceptions allowed in assessing individual property, and the taxation shall not be at a greater rate than is assessed on other moneyed capital of individuals. *Held*, that there was no discrimination against national banks, within Rev. St. U. S.

§ 5219, authorizing a state to tax national bank shares, but not at a rate greater than assessments on other moneyed capital of individuals.

Certiorari by the people, on the relation of John G. Jenkins and others, against Barzillai G. Neff and others, assessors of the city of Brooklyn, to review the assessment of relators' stock in the First National Bank of Brooklyn. Order modifying and affirming referee's report.

Peck & Field (Frank Harvey Field, of counsel), for relators.

John Whalen, Corp. Counsel (William J. Carr, of counsel), for respondents.

HIRSCHBERG, J. Certiorari to review the assessment of relators' stock in the First National Bank of Brooklyn. The entire shares are 3,000, of the par value of $100 each. The original assessment was at the rate of $393 per share. This amount was reached by taking the capital at $300,000, the surplus at $900,000, and the undivided profits at $30,303.54, making in all $1,230,303.54, and deducting $50,000, the assessed value of the real estate owned by the bank. A division of the remainder by the number of shares making the entire capital produced the result indicated. Complaint being made on grievance day, the assessors, after taking testimony, reduced the assessment to the sum of $336 per share. This figure was reached by valuing the capital, surplus, and undivided profits at $1,253,226, or the sum of $417.74 for each share. From this was deducted 4 per cent. upon the loans and discounts, amounting per share to $46.48, the assessed value of the real estate amounting to $19.93, the amount of dividends paid for preceding six months, amounting to $8, and the amount of tax paid the preceding year, amounting to $7.07,—in all $81.48 per share,—and leaving, the odd cents being disregarded, $336 per share, as has been said, as the amount finally fixed and assessed. On the return of the writ a reference was ordered, and the referee reduced the assessment to the sum of $268.06 per share. This reduction was effected in two items, viz. the sum of $14.33 per share was deducted as the proportionate difference per share between the assessed value of the real estate, $50,000, and its actual value, $93,000; and $53.61 per share was deducted in assumed compliance with section 24, c. 908, of the Laws of 1896, as a sum which bears the same proportion to the value of the shares as the assessed value of the real estate of the bank bears to its capital stock. The case is now before the court for determination pursuant to section 253 of the tax law (chapter 908, Laws 1896).

No question has been raised before me in reference to the amounts at which the respondents have fixed the capital, surplus, and undivided profits of the bank, or the actual or assessed value of its real estate, nor, indeed, as to the accuracy of the various sums which the respondents deducted in determining the assessable value of the shares. The respondents do contend, however, that the learned referee was in error in deducting the additional sum of $43,000 for the real estate, and in this contention I think they are correct. The real estate in question appears among the resources of the bank as worth $93,000, and both parties in the briefs submitted to me agree that

this sum represents the actual, full value as distinguished from the assessed value. There is no proof as to the assessment of other real estate in Brooklyn. Section 12 of the tax law provides that the capital stock shall be assessed at its actual value after deducting the assessed value of the real estate, and section 24 provides that in assessing shares of bank stock there shall be deducted from the value of such shares such proportionate sum as the assessed value of the real estate bears to the value of the shares. If the real estate appears in the assets at an actual value greater than the assessed value, and the shares are estimated at a value which is based in part upon the excess, it by no means follows, as the relators contend, that there is a double assessment upon the real estate. The institution and the shareholders are distinct. The inquiry in question is as to the value of the shares as such, and into that question enters every element of value possessed by the corporation and belonging to the shareholders. The actual value of the real estate, although separately assessed, is such an element tending directly to the value of the shares. The deduction of the assessed valuation of the real estate only is in compliance with the language of the statute, and in accordance with the practice and the adjudicated cases. People v. Commissioners of Taxes & Assessments, 69 N. Y. 91; People v. Asten, 100 N. Y. 597, 3 N. E. 788; People v. Coleman, 126 N. Y. 433, 27 N. E. 818; People v. Barker, 144 N. Y. 94, 39 N. E. 13. The rule is correctly stated by the relators in their petition: "That in making an assessment on the shares of stock of national banks there shall only be deducted from the value of such shares the assessed value of the real property." The relators' contention is that this rule results in double taxation, and in the assessment of the real estate of banks at a higher rate than other real estate. The contention seems to me unfounded, and, in the absence of any evidence showing the adoption of a different rule or rate in the assessment of other bank stock or other real estate in Brooklyn than in this case, it follows that the deduction of $14.33 per share, made by the referee, was erroneous. The real point of the relators' contention is that in estimating the value of bank stock the real estate shall be taken at only its assessed valuation. But, as was said in People v. Barker (page 100, 144 N. Y., and page 15, 39 N. E.):

"In case of corporations it may happen that an undervaluation in the assessment of the real estate as such will be corrected in its valuation as part of the capital, and so the undervaluation may be remedied, and the whole property be subjected to taxation at its real value. The fact, therefore, that the assessed value of the relator's real estate was $1,515,400 does not necessarily show that it was its full value, nor did it, we think, preclude the commissioners from estimating its value for the purpose of ascertaining the capital subject to taxation as its actual value, although it exceeded the assessed value. The act of the commissioners in undervaluing the real estate in its assessment as such did not estop the public, nor relieve them of the duty, in ascertaining the value of the capital, to estimate the real estate at its full value. We are not here concerned with any question of inequality of assessment as between the relator and other taxpayers. We hold that the commissioners could legally disregard the assessed value of the real estate in estimating the value of the capital, and the question of legality is the only point now in question."

In that case the assessment, both of the real estate and on the capital, was against the corporation, but the reasoning is stronger

where the real estate only is assessed against the corporation, while the personal assessment is against shareholders whose property is separate and distinct from that of the corporation, although necessarily estimated upon the valuation of the property of the corporation.

The additional deduction of $53.61 per share, made by the referee, is conceded by the relators to have been erroneous, and, therefore, no consideration of the question involved is necessary.

The main contention of the relators, however, is that the entire assessment is illegal, as in contravention of section 5219, Rev. St. U. S. This is the provision of the federal law which authorizes the state to tax the shares of national banking associations, but expressly subject to the restriction "that the taxation shall not be at a greater rate than is assessed upon other moneyed capital in the hands of individual citizens." I agree with the learned referee in holding that the assessment in this case is not violative of the restriction. The argument for the relators is based upon the fact that in the assessment of trust companies United States bonds and other nontaxable investments are deducted, together with so much of the surplus profits or reserve funds as equals 10 per cent. of the company's capital (Tax Law, § 12), while the value of the bank shares is estimated without the allowance of such deductions. It is conceded by the relators that the alleged discrimination is of no avail unless, as stated in the brief, "the moneyed capital invested in trust companies comes in competition with the moneyed capital invested in national banks." That there was no such competition between trust companies and national banks was held by the supreme court of the United States in the year 1887 in the case of Mercantile Bank v. City of New York, 121 U. S. 138, 7 Sup. Ct. 826. But the relators claim that chapter 696 of the Laws of 1893, which added an eleventh subdivision to section 156 of the banking law (chapter 689, Laws 1892), conferred upon trust companies all the powers given to individual banks and bankers by section 55 of the banking law, and that, being thus invested with the power of discounting paper, the trust companies are engaged in the banking business, and thus come into direct competition with the national banks. In the Mercantile Bank Case it was held that the purpose of congress in fixing limits to state taxation on investments in shares of national banks was to render it impossible for the state, in levying such a tax, to create and foster an unequal and unfriendly competition by favoring institutions or individuals carrying on a similar business with the banks. "The business of banking," said the court (page 156, 121 U. S., and page 835, 7 Sup. Ct.), "as defined by law and custom, consists in the issue of notes payable on demand, intended to circulate as money where the banks are banks of issue; in receiving deposits payable on demand; in discounting commercial paper; making loans of money on collateral security; buying and selling bills of exchange; negotiating loans, and dealing in negotiable securities issued by the government, state and national, and municipal and other corporations. These are the operations in which the capital invested in national banks is employed, and it is the nature of that employment which constitutes it in the eye of this stat-

ute 'moneyed capital.'" The court then examined the nature of the business of trust companies under the powers conferred by the New York statutes, and concluded that, although they receive money on deposit, and invest it in loans, and so deal in money and securities for money in such a way as properly to bring the shares of stock held by individuals therein within the definition of moneyed capital in the hands of individuals, as used in the act of congress, yet trust companies are not banks, in the commercial sense of the word, and do not perform the functions of banks in carrying on the exchanges of commerce. Page 159, 121 U. S., and page 837, 7 Sup. Ct. The court then considered the question of unfair discrimination in the rate of taxation, and decided that, as the tax laws of the state required an assessment upon the capital of trust companies at its actual value for local purposes, and, in addition to this, a state tax upon franchise based upon income, there was no inequality, notwithstanding the deduction of government bonds and other nontaxable securities. "It is evident," said the court (page 160, 121 U. S., and page 838, 7 Sup. Ct.), "we think, that taxation in this mode is, at least, equal to that upon the shares of individual stockholders, for, if the same property was held for the same uses, and taxed by the same rule, in the hands of individuals, as moneyed capital, it would be subject to precisely the same deductions; in addition to which the individual would be entitled to make a further deduction of any debts he might owe. Upon these grounds, therefore, we are of opinion that this mode of taxing trust companies does not create the inequality which the appellant alleges." The Mercantile Bank Case has been followed in principle in Newark Banking Co. v. City of Newark, 121 U. S. 163, 7 Sup. Ct. 839; Davenport Nat. Bank v. Davenport Board of Equalization, 123 U. S. 83, 8 Sup. Ct. 73; Bank of Redemption v. City of Boston, 125 U. S. 60, 8 Sup. Ct. 772; Palmer v. McMahon, 133 U. S. 660, 10 Sup. Ct. 324; First Nat. Bank of Aberdeen v. Chehalis Co., 166 U. S. 440, 17 Sup. Ct. 629; and National Bank of Commerce v. City of Seattle, 166 U. S. 463, 17 Sup. Ct. 996.

It is difficult to see how the amendment of 1893, upon which the relators rely to take this case out of the operation of these decisions, makes any material difference in the nature of the business of trust companies as conducted before and since. The added subdivision 11, hereinbefore referred to, authorized trust companies "to exercise the powers conferred on individual banks and bankers by section 55 of this act, subject to the restrictions contained in said section." The relators claim that this amendment conferred on trust companies, for the first time, the power to discount commercial paper. It is noticeable, however, that this power is not conferred upon individual banks and bankers by section 55 of the banking law. It is conferred by section 43 in the words "to carry on the business of banking; by discounting and negotiating promissory notes, drafts, bills of exchange and other evidences of debt." Section 55 is headed "Rate of Interest," and is as follows:

"Every bank and individual banker doing business in this state may take, receive, reserve and charge on every loan or discount made, or upon any note, bill of exchange or other evidence of debt, interest at the rate of six per cent.

per annum: and such interest may be taken in advance, reckoning the days for which the note, bill or evidence of debt has to run. The knowingly taking, receiving, reserving or charging a greater rate of interest shall be held and adjudged a forfeiture of the entire interest which the note, bill or other evidence of debt carries with it, or which has been agreed to be paid thereon. If a greater rate of interest has been paid, the person paying the same or his legal representatives may recover back twice the amount of the interest thus paid from the bank or individual banker taking or receiving the same, if such action is brought within two years from the time the excess of interest is taken. The purchase, discount or sale of a bona fide bill of exchange, note or other evidence of debt payable at another place than the place of such purchase, discount or sale at not more than the current rate of exchange for sight drafts, or a reasonable charge for the collection of the same, in addition to the interest, shall not be considered as taking or receiving a greater rate of interest than six per cent. per annum. The true intent and meaning of this section is to place and continue banks and individual bankers on an equality in the particulars herein referred to with the national banks organized under the act of congress, entitled 'An act to provide a national currency, secured by pledge of United States bonds, and to provide for the circulation and redemption thereof,' approved June 3, 1864.''

Reading this whole section together, it is evident that the effect and intention of the amendment was to permit the deduction of interest in advance by trust companies on all purchases of paper or other evidence of debt which they might legally make, and to put them on an equality with the banks so far as concerns the question of interest and usury. Assuming, however, that it confers the power of discounting commercial paper in the banking sense, it falls very short of bringing trust companies into competition with the national banks, or of constituting the business of such companies banking business in the sense of the reasoning in the Mercantile Bank Case and the other cases cited. The distinctive business of such companies is to accept and execute trusts committed to them by the courts and by individuals; to receive moneys in trust, and to accumulate the same at an agreed rate of interest; to receive the title to real or personal estate on trusts created in accordance with the laws of the state, and to execute such trusts; to accept and execute trusts for married women in respect to their separate property; to act as guardian for the estates of infants; and to act as agents for corporations in reference to issuing, registering, and transferring certificates of stocks and bonds and other evidences of debt. They, incidentally to this business, are permitted to receive money on deposit, and invest it in loans, and may employ it, on the relators' theory, in the general discount of commercial paper. The distinctive business of the national banks is to issue notes payable on demand and intended to circulate as money; to receive deposits payable on demand; to discount commercial paper; to make loans of money on collateral security; to buy and sell bills of exchange; to negotiate loans; and to deal in negotiable securities issued by the government, state and national, and municipal and other corporations. Trust companies do not perform the functions of banks in carrying on the exchanges of commerce. By law their capital must be invested in United States bonds, state or municipal bonds, and first mortgages on improved real estate. The field of investment is narrow, and the rate of interest low. The banks, beyond the amount of their capital deposited to secure the issue of currency, do not appear to be equally restricted. While

some of the functions of the business carried on by the two classes of corporations are identical; the essential features are sufficiently diverse to avoid competition between the moneyed capital invested in them within the spirit of the cases cited. Nor can it be said, on the facts before the court, that any inequality exists in the mode of taxation. The amount of the franchise tax paid by the trust companies is not shown, and it would be a violent assumption to find that such a tax, based on income, together with a tax upon the actual value of corporate capital and surplus with all deductions allowed by law, constitutes a system which as a system discriminates in any appreciable degree in favor of the trust companies and against the national banks or the owners of their stock. The deduction for nontaxable securities and debts is the same as would be allowed if the same property was held for the same uses in the hands of individuals. See cases cited, and also Van Allen v. Assessors, 3 Wall. 573, and People v. Commissioners of Taxes & Assessments, 4 Wall. 244. The deduction from the surplus to the extent of 10 per cent. of the capital antedates these decisions, and has never been regarded as an unfair discrimination. There is no evidence of a legislative intent to make such discrimination. In the Davenport Bank Case, supra, it was held, with reference to section 5219, that if a state statute creating a system of taxation does not, on its face, discriminate against national banks, and there is neither evidence of a legislative intent to make such discrimination, nor proof that the statute works an actual and material discrimination, there is no case for holding it to be violative of the restriction contained in the section. By the terms of section 24 of the tax law of this state, it is provided that in assessing national bank stock each stockholder shall be allowed all the deductions and exceptions allowed by law in assessing the value of other taxable property owned by individual citizens of this state, and the assessment and taxation shall not be at a greater rate than is made and assessed upon other moneyed capital in the hands of such individual citizens. The words of section 5219 are adopted. There is, therefore, neither legislative intent nor actual discrimination exhibited, nothing tending in any degree to discourage private capital from contributing to the national banking system, or to drive it into other channels of kindred investment.

The various other points and suggestions presented by the relators have been considered, but none of them disturbs the conclusion reached. The final order will modify the referee's report in the two particulars indicated, affirming it as so modified, and leaving the assessment as fixed by the respondents.

Ordered accordingly.