933 A.2d 75

**ALLFIRST BANK, Appellant**

**v.**

**COMMONWEALTH of Pennsylvania, Appellee**

**Allfirst Bank, Appellant**

**v.**

**Commonwealth of Pennsylvania, Appellee.**

**Nos. 82 MAP 2006, 83 MAP 2006.**

Supreme Court of Pennsylvania.

Argued March 7, 2007.

Decided Oct. 17, 2007.

632

Gregory James Krock, Jeffrey S. Blum, Buchanan Ingersoll & Rooney, P.C., Pittsburgh, for Allfirst Bank, appellant.

Carol L. Weitzel, Thomas W. Corbett, Michael Adam Roman, PA Office of Atty. Gen., for the Com of Pa, appellee.

Before CAPPY, C.J., CASTILLE, SAYLOR, EAKIN, BAER and BALDWIN, JJ.

## OPINION

Justice SAYLOR.

These direct appeals involve the issue of whether Pennsylvania's bank and trust company shares tax is a tax levied against the financial institution itself, or a personal property tax imposed on its shareholders.

Banking institutions in Pennsylvania are exempt from both the capital stock/franchise tax and the corporate net income tax. *See* 72 P.S. §§ 7402(c), 7602(i).[1] However, under Article VII of the Tax Reform Code of 1971,[2] banks operating

1. Prior to 2001, the exemptions were reflected in the definitional sections of these taxes. *See* 72 P.S. § 7601(a) (West 2000) (defining domestic and foreign entities to exclude banks); 72 P.S. § 7401(1) (West 2000) (defining "corporation" to exclude banks). These definitions were altered by Sections 13 and 11, respectively, of the Act of June 22, 2001, P.L. 353, No. 23, but the exemptions remain, as per the above.

2. Act of March 4, 1971, P.L. 6 (as amended, 72 P.S. §§ 7101–10004) (the "Tax Code").

in the Commonwealth are subject to a bank shares tax. *See generally* 72 P.S. §§ 7701–7706 (setting forth Article VII).[3] The enactment provides, in relevant part:

> Every institution shall, on or before March 15 in each and every year, make to the Department of Revenue a report in writing . . . setting forth the full number of shares of the capital stock subscribed for or issued, as of the preceding January 1, by such institution, and the taxable amount of such shares of capital stock determined pursuant to [72 P.S. § 7701.1]. It shall be the duty of the Department of Revenue to assess such shares for . . . each calendar year . . . at the rate of 1.25 per cent upon each dollar of taxable amount thereof, the taxable amount of each share of stock to be ascertained and fixed pursuant to [72 P.S. § 7701.1], and dividing this amount by the number of shares. It shall be the duty of every institution, at the time of making every report required by this section, to compute the tax and to pay the amount of said tax to the State Treasurer . . . either from its general fund, or from the amount of said tax collected from its shareholders. . . .

72 P.S. § 7701.

■ The method of ascertaining the value of the shares is set forth in Section 701.1 of the statute, *see* 72 P.S. § 7701.1. If a bank is "subject to tax in another state based on or measured by net worth, gross receipts, net income or some similar base of taxation, or if it could be subject to such tax, whether or not such a tax has in fact been enacted," the present tax is imposed only on the taxable value of shares apportionable to Pennsylvania.[4]

3. With the Act of June 16, 1994, P.L. 279, No. 48, both banks and trust companies were encompassed under Article VII and subject to the same provisions. Because Appellant is a bank, the tax in issue here will be referred to as the bank shares tax, although Article VII is titled, "Bank and Trust Company Shares Tax."

4. Apportionment is required because, under the Commerce and Due Process Clauses of the United States Constitution, U.S. Const. art. I, § 8, cl. 3; U.S. Const. amend. XIV, § 1, states may only impose taxes on value attributable to in-state business activity. *See Unisys Corp. v. Commonwealth, Bd. of Fin. & Revenue*, 571 Pa. 139, 143, 145 n. 2, 812 A.2d 448, 450, 451 n. 2 (2002). A three-factor formula, based on

According to the Stipulation of Facts entered into by the parties for purposes of this litigation, see Pa.R.A.P.1571(f), Appellant, Allfirst Bank, is a bank chartered and headquartered in Maryland that conducts banking operations in Pennsylvania.[5] Appellant was a wholly-owned subsidiary of First Maryland Bancorp (FMB) until September 1999, when FMB merged with and into Allfirst Financial, Inc. (AFI). FMB and AFI were incorporated in Maryland and Delaware, respectively, and, at all relevant times, maintained a primary place of business in Baltimore, Maryland. Neither parent corporation conducted business in Pennsylvania at any time relevant to this appeal. The tax periods at issue are January 1, 1999 and January 1, 2000. See Stipulation of Facts at ¶¶ 1–8, RR. 1a–2a.

Appellant timely reported its taxes for January 1, 1999, and January 1, 2000, and paid the liabilities as indicated on the reports. The Department of Revenue resettled these reports, requiring Appellant to pay an additional $10,207,638 in bank share taxes. Appellant appealed to the Board of Finance and Revenue, arguing that it, as a corporation, is not subject to the bank shares tax, and that the tax should instead be levied upon its shareholders. Appellant further maintained that its sole shareholder (first FMB, then AFI) could not constitutionally be subject to the tax because Appellant is a foreign corporation not organized under the laws of Pennsylvania and neither FMB nor AFI is incorporated or commercially domiciled in Pennsylvania. After the Board affirmed the resettlements, Appellant petitioned for review in the Commonwealth Court, renewing its contention that the tax at issue is intended to be imposed upon its shareholders, and that the constitution prohibits such taxation in the present case because FMB and AFI were neither incorporated nor commercially domiciled in Pennsylvania.

payroll, receipts, and deposits, is used to accomplish apportionment. See 72 P.S. § 7701.4(1).

5. Appellant was known as FMB Bank until June 29, 1999, when it changed its name to Allfirst Bank.

A divided, en banc panel of the Commonwealth Court affirmed the Board's orders. *See Allfirst Bank v. Commonwealth,* 895 A.2d 669 (Pa.Cmwlth.2006) *(en banc).* In an opinion authored by Judge McGinley, the majority initially acknowledged that, in the instructions accompanying the required ·bank shares tax reports, the Department of Revenue had indicated that the tax was imposed on shareholders; additionally, on its website, the Department stated that shares of stock held by exempt holders—including charitable, religious, and educational institutions—are exempted from the tax. The majority similarly noted that, in a case from the 1940s, the Court of Common Pleas of Dauphin County—which at the time heard appeals from tax resettlements—had concluded that a previous enactment of the bank shares tax was "a tax not upon the bank but upon the shareholders." *Commonwealth v. First National Bank of Scranton,* 48 Pa. D. & C. 399, 408 (CCP Dauphin 1943). However, the majority distinguished *Scranton* from the present matter in that the statutory language, as it existed in 1943, required the tax to be collected from shareholders, whereas the present statute gives banks the option of paying the tax from their general fund or from monies collected from shareholders. *See* 72 P.S. § 7701.

The Commonwealth Court majority also considered the practical effect of the bank shares tax and compared the present matter to *Society for Savings in the City of Cleveland, Ohio v. Bowers,* 349 U.S. 143, 75 S.Ct. 607, 99 L.Ed. 950 (1955), in which the Supreme Court held that a state tax similar to the present bank shares tax was imposed upon the banks themselves and not upon the banks' depositors.[6] The Commonwealth Court identified three factors that the Supreme Court found significant in *Bowers:* (1) the state was not entitled to collect the tax from depositors; (2) the statute did not relieve the bank from paying tax on the interest of former depositors who had withdrawn their accounts prior to the tax due date; and (3) the bank had no statutory right to make

6. The depositors of the mutual savings banks in question were deemed to have an interest similar to that of shareholders of other banks. *See id.* at 147, 75 S.Ct. at 609.

itself whole from its depositors for taxes paid on their account. *See id.* at 151–52, 75 S.Ct. 607. Applying these factors to the present situation, the Commonwealth Court majority noted that the Commonwealth may not directly enforce the bank shares tax against shareholders should the bank default on the payment of the tax; banks must pay the tax on the interest of a shareholder who sells his investment after the assessment date but prior to the payment date; and banks have no statutory right to recover the tax from their shareholders. Finally, the majority considered the statutory language as supporting the conclusion that the tax is levied on the bank and not the shareholders. *See Allfirst Bank,* 895 A.2d at 672–73.

With regard to the constitutionality of the tax, although Appellant relied upon *Utah Mortgage Loan Corp. v. Gillis,* 49 Idaho 676, 290 P. 714 (1930), for the position that a property tax levied upon a nonresident shareholder who was neither incorporated nor domiciled in the taxing state violates the Fourteenth Amendment's Due Process Clause, *see* U.S. CONST. amend. XIV ("nor shall any State deprive any person of life, liberty, or property, without due process of law"), the majority observed, consistent with the above, that the tax is enforced against banks and not against shareholders. Because the bank shares tax is only assessed on the value of the bank's shares apportioned to Pennsylvania, the majority concluded that the tax fell within constitutional limitations. *See Allfirst Bank,* 895 A.2d at 673–74.[7]

Judge Friedman dissented, concluding that a plain reading of Section 701 indicates that the bank shares tax is imposed upon shareholders. The dissent afforded greater weight than the majority to the Department's tax-form instructions and approach to exemptions. *See Allfirst Bank,* 895 A.2d at 675 (Friedman, J., dissenting). In addition, the dissent interpreted Section 701 as giving banks the right to collect the tax from

7. The majority also stated that federal statutory law permits imposition of such a tax on out-of-state banks that have an in-state branch, so long as the tax is based on a method which includes allocation and apportionment, as is true of the bank shares tax. *See id.* at 674 (quoting 12 U.S.C. § 1831u(c)(1)(B)).

shareholders. Further, Judge Friedman found the Supreme Court's decision in *Schuylkill Trust Company v. Pennsylvania*, 302 U.S. 506, 58 S.Ct. 295, 82 L.Ed. 392 (1938) ("*Schuylkill Trust II*"), more analogous to the present taxing scheme than *Bowers*. In *Schuylkill Trust II*, the Court interpreted a Pennsylvania statute imposing a tax on trust company shares, which permitted a company to pay the tax from its general fund or out of funds collected from its shareholders. Noting that prior decisions of the Supreme Court of Pennsylvania had construed the tax as levied against shareholders and that the statute on its face "lays the tax upon the property of the stockholder, represented by the shares he owns," the *Schuylkill Trust II* Court concluded that the tax was imposed upon shareholders and not the assets of the trust company. *See id.* at 512–13, 58 S.Ct. at 298. Similarly, in the dissent's view, the present bank shares tax on its face taxes the property of shareholders rather than the banks themselves. Judge Friedman also concluded that the tax violates the Fourteenth Amendment, as the Commonwealth has not extended benefits or protection to the shares of non-resident shareholders such that the State has authority to tax those shares. *See Allfirst Bank*, 895 A.2d at 675–77 (Friedman, J., dissenting).

On appeal to this Court, Appellant again maintains that the bank shares tax is not levied against financial institutions themselves, but against the (intangible) personal property of their shareholders. In support of this contention, Appellant largely echoes the arguments of the Commonwealth Court dissent, and indicates as well that the Commonwealth does not dispute that the tax is unconstitutional to the extent it purports to tax the personal property of a foreign corporation that is not commercially domiciled in Pennsylvania and does not conduct banking activities here. As to the latter point, Appellant stresses that shares of stock have historically been considered to be present at the owner's domicile, and that, accordingly, Appellant's non-domiciliary owner's property nominally subject to taxation under the bank shares tax (i.e., all shares of stock in Appellant) is located out-of-state, and thus, may not constitutionally be taxed by Pennsylvania. Fi-

nally, Appellant develops at length that the Commonwealth, in its submissions filed in *Dale National Bank v. Commonwealth*, 502 Pa. 170, 465 A.2d 965 (1983), took a position that is consistent with the bank's present one, namely, that the bank shares tax imposes a tax on shareholders.

The Commonwealth, conversely, agrees with the Commonwealth Court majority in advancing the position that, regardless of how the tax may be characterized, its practical effect is to tax the financial institution, and not the shareholders. Such a tax, the Commonwealth maintains, is permissible in the present context where the bank conducts business in Pennsylvania, the tax is apportioned to reach only that segment of value attributable to in-state activities, and the tax does not otherwise run afoul of federal statutory law. As for the Department's administrative documents and practices which refer to the tax as a property tax on shares, the Commonwealth portrays these as "remnants of history, having their roots in a time before artificial distinctions were supplanted by a focus on practical effects in the analysis of the nature of a tax." Brief for Commonwealth at 8.

■ The distinction between a tax levied on a bank and one imposed on its shareholders has its roots in the doctrine of intergovernmental immunity. Absent congressional authorization, a state may not tax a national bank or the obligations of the federal government, such as federal bonds. *See generally Bowers*, 349 U.S. at 144, 75 S.Ct. at 608 (tracing the evolution of the doctrine).[8] The concept of taxing shares of stock rather

8. The intergovernmental immunity concept was developed by Mr. Chief Justice John Marshall in *M'Culloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 4 L.Ed. 579 (1819), in which the Court held that states could not tax the operations of a bank of the United States. *See id.* at 436. This principle was extended to state taxation of any bank's capital or net worth to the extent that its holdings included federal securities, as such taxation would place an economic burden on the value and/or marketability of those securities. *See Weston v. City Council of Charleston*, 27 U.S. (2 Pet.) 449, 7 L.Ed. 481 (1829) (protecting the borrowing power of the United States by immunizing federal obligations from state taxation absent congressional approval); *see also Plummer v. Coler*, 178 U.S. 115, 127-28, 20 S.Ct. 829, 834, 44 L.Ed. 998 (1900) ("[S]tates have no power, by taxation or otherwise, to retard, impede, burden or in any manner control the operations of the instrumentalities of the national

than the bank's net assets or capital stock as such ultimately developed as a "legal fiction ... to permit the base of the tax to include federal obligations," Joseph Bright, 26 SUMM. PA. JUR.2D TAXATION § 3:6, the theory being that corporate shares are property interests separate from the corporation's ownership of its assets, even where the value of that discrete interest is measured by underlying assets that include United States obligations. *See Van Allen v. Assessors,* 70 U.S. (3 Wall) 573, 583, 18 L.Ed. 229 (1865); *Des Moines Nat'l Bank v. Fairweather,* 263 U.S. 103, 112–13, 44 S.Ct. 23, 26, 68 L.Ed. 191 (1923); *Bowers,* 349 U.S. at 147, 75 S.Ct. at 609; *see also Cleveland Trust Co. v. Lander,* 184 U.S. 111, 22 S.Ct. 394, 46 L.Ed. 456 (1902) (applying this reasoning to the stock of state-created banks); *Corry v. City of Baltimore,* 196 U.S. 466, 477–79, 25 S.Ct. 297, 300–01, 49 L.Ed. 556 (1905) (allowing a state to require payment of the tax by the bank, as collecting agent for the shareholders). The Supreme Court approved this method, indicating that a tax on the shares of a bank in the hands of its shareholders could reflect the value of federal obligations. *See Van Allen,* 70 U.S. (3 Wall) at 588. Shortly after the *Van Allen* decision was announced, the General Assembly enacted the Pennsylvania Bank Shares Tax. *See* Act of February 23, 1866, P.L. 82, No. 69. *See generally* Bright, 26 SUMM. PA. JUR.2D TAXATION § 3:3 (providing background and historical context for the present bank and trust company shares tax). Presumably, for the above reasons, the Legislature couched various aspects of the statute in terms of a taxation of shares. Furthermore, the Department's instructions for filing tax returns, and its approach of excluding

government[.]"); *cf. Des Moines Nat'l Bank v. Fairweather,* 263 U.S. 103, 106, 44 S.Ct. 23, 24, 68 L.Ed. 191 (1923) (noting that, in light of the purpose served by national banks relative to the United States, such institutions may not be taxed under state authority except as assented to by Congress); *Schuylkill Trust Co. v. Commonwealth of Pennsylvania,* 296 U.S. 113, 120, 56 S.Ct. 31, 35, 80 L.Ed. 91 (1935) (finding it unacceptable for a state to allow a deduction from the tax base for holdings in companies that the state has already taxed, but not to allow the same deduction for federal securities held by the taxpayer). *See generally* Gary Patrick Poon, *State Taxation of Bank Shares: American Bank & Trust Company v. Dallas County,* 3 ANNUAL REVIEW OF BANKING LAW 391, 420 (1984).

valuation from shares held by charitable, religious, and educational organizations, certainly adds further credence to the notion that the tax is upon shareholders, as highlighted by Judge Friedman.

 In the present era, however, the incentive to distinguish between taxing a bank and taxing its shareholders no longer exists. For one thing, Congress has moved to prohibit "direct or indirect" state and local taxation of federal obligations, see 31 U.S.C. § 742 (repealed and recodified as amended at 31 U.S.C. § 3124(a)), thus legislatively foreclosing states' ability to accomplish indirectly (through taxation of shares) what they could not achieve directly (taxing the value of federal obligations). *See American Bank & Trust Co. v. Dallas County*, 463 U.S. 855, 103 S.Ct. 3369, 77 L.Ed.2d 1072 (1983) (construing a 1959 amendment to Section 742 to preclude state taxation of corporate shares to the extent their value is measured by federal obligations).[9] Additionally, fed-

---

**9.** In reaching its conclusion in this regard, the *Dallas County* Court interpreted the legislative change as setting aside what it termed the "formal but economically meaningless" distinction between a tax on discrete property interests such as corporate shares whose value is measured by United States obligations, and a tax on the government obligations themselves. *Id.* at 858, 103 S.Ct. at 3372. Likewise, the Court noted that "the practical impact of [a tax on corporate shares whose value derives in part from federal obligations held by the corporation] is indistinguishable from that of a tax imposed directly on corporate assets that include federal obligations." *Dallas County,* 463 U.S. at 862, 103 S.Ct. at 3374 (citing *Bowers,* 349 U.S. at 148, 75 S.Ct. at 610).

This Court almost immediately applied *Dallas County's* holding to Pennsylvania's bank shares tax in the *Dale National Bank* case, resulting in a large tax refund liability, plus loss of future revenues, on the part of the Commonwealth, *cf. First Nat'l Bank of Fredericksburg v. Commonwealth,* 520 Pa. 244, 553 A.2d 937 (1989) (invalidating the so-called "single excise tax," a one-time tax on all banks designed to recover the monies refunded pursuant to *Dale National Bank*), a development that has led one commentator to remark that the "legal fiction" of taxing shares of capital stock rather than the bank itself is now "pointless" in the post-*Dale National Bank* era. Bright, 26 SUMM PA. JUR 2D TAXATION § 3:6; *see also id.* at 3:1 ("The form of the tax is a dinosaur which has lived far beyond its useful time. Originally designed to circumvent a problem in the taxation of federal obligations, the taxes no longer accomplish their purpose."). Subsequently, the General Assembly compensated for the lost revenues by increasing the tax rate more than ten-fold—to 10.77 percent—for the year 1990 only,

eral law no longer limits the ability of states to tax national banks directly. *See* 12 U.S.C. § 548 ("For the purposes of any tax law enacted under authority of the United States or any State, a national bank shall be treated as a bank organized and existing under the laws of the State or other jurisdiction within which its principal office is located.").

Significantly, while the bank shares tax evolved in an era in which there were substantial incentives to direct the incidence of taxation toward shareholders, the statute was crafted in a more hybridized fashion. Indeed, under the express terms of the statute, the tax is assessed in the name of individual banks, and its direct and immediate incidence falls squarely on the banks. *See* 72 P.S. § 7701 ("It shall be the duty *of every institution,* at the time of making every report required by this section, to compute the tax and *to pay the amount of said tax* to the State Treasurer." (emphasis added)). For example, in the present case, Appellant acknowledges that it, and not its shareholder, paid the taxes in question. Furthermore, the calculation of the tax is based on the book value of the bank's net assets (adjusted to deduct value attributable to United States obligations). *See* 72 P.S. § 7701.1. Although Appellant is correct that, in *Dale National Bank,* the Commonwealth took the position that the bank shares tax was a tax on shareholders, it is significant that the Commonwealth did not prevail in this argument. Rather, the Court determined that "it is clear that the bank shares tax is imposed on capital owned and employed by petitioner in its banking operations[.]" *Dale National Bank,* 502 Pa. at 177, 465 A.2d at 968. Thus, although this pronouncement was made in a portion of the decision addressing the taxability of state and municipal obligations, and did not directly implicate the question presented in the instant appeal, it shows that this Court has previously recognized that the Bank Shares Tax, in substance, is appropriately regarded as a tax on banks.

As developed by the Commonwealth Court majority, this conclusion is consistent with a "practical effects" analysis

and then setting it at 1.25 percent for subsequent years. *See* Act of July 1, 1989, P.L. 95, No. 21; 72 P.S. § 7701.

utilized by the United States Supreme Court relative to constitutional challenges to state taxing schemes. *See Lawrence v. State Tax Comm'n*, 286 U.S. 276, 280, 52 S.Ct. 556, 557, 76 L.Ed. 1102 (1932) ("[I]n passing on [a taxing scheme's] constitutionality we are concerned only with its practical operation, not its definition or the precise form of descriptive words which may be applied to it.").[10] In this regard, we agree with the intermediate appellate court that the most helpful Supreme Court case is *Society for Savings in the City of Cleveland, Ohio v. Bowers*, 349 U.S. 143, 75 S.Ct. 607, 99 L.Ed. 950 (1955). That matter involved the proper interpretation of an Ohio statute assessing a tax relative to mutual savings banks. Although the tax was assessed in the names of the banks upon the book value of their net assets, it was nominally levied against the depositors of such banks. *See id.* at 145–46, 75 S.Ct. at 609. Therefore, the question arose whether the tax base could include the value of United States bonds pursuant to the *Van Allen* rule. The Ohio Supreme Court answered in the affirmative, based on its conclusion that the tax was levied against depositors rather than the banks. The United States Supreme Court criticized this interpretation; while acknowledging that the state court's ruling was final as to any question pertaining to state law, the Court continued:

> Were we free to construe Ohio's statute *de novo* we might have difficulty in reaching the conclusion which the Ohio court did. Suffice it to say at this point: The statute is barren of any language expressly imposing this tax on the

**10.** *See also State of Wisconsin v. J.C. Penney Co.*, 311 U.S. 435, 444, 61 S.Ct. 246, 249, 85 L.Ed. 267 (1940); *Schuylkill Trust Co. v. Commonwealth*, 296 U.S. 113, 119, 56 S.Ct. 31, 34, 80 L.Ed. 91 (1935) (*"Schuylkill Trust I"*) ("We must determine for ourselves the true nature of the tax by ascertaining its operation and effect."); *Senior v. Braden*, 295 U.S. 422, 429, 55 S.Ct. 800, 802, 79 L.Ed. 1520 (1935) ("Our concern is with realities, not nomenclature."); *Educational Films Corp. v. Ward*, 282 U.S. 379, 387, 51 S.Ct. 170, 171, 75 L.Ed. 400 (1931) ("[T]he nature of a tax must be determined by its operation rather than by particular descriptive language which may have been applied to it."); *see also Trinova Corp. v. Michigan Dep't of Treasury*, 498 U.S. 358, 374, 111 S.Ct. 818, 829, 112 L.Ed.2d 884 (1991) ("A tax on sleeping measured by the number of pairs of shoes you have in your closet is a tax on shoes." (internal quotation marks omitted)).

depositors, and contains no provision giving the bank any right to recover the tax from the depositors, as might be expected if the bank had been regarded as a mere tax-collecting agent.

*Id.* at 148, 75 S.Ct. at 610. The Court contrasted this situation with other provisions of the Ohio General Code which levied taxes against corporate shares in which the bank was "given full rights of reimbursement from the stockholders or depositors, as the case may be, and it is clear that the institution in paying such taxes is acting only as a collection agent." *Id.* at 148–49 & n. 8, 75 S.Ct. at 610 & n. 8. As the Court continued its analysis, the consideration of whether the statute contained any mechanism for the bank to recover taxes paid out became the third, and most important, element of a three-pronged test to determine the true incidence of the tax. In particular, the Court considered (1) whether the state could collect the tax from the depositors should the bank fail to pay it; (2) whether the bank was relieved from liability as to the interests of depositors who had an account on the assessment date of the tax, but withdrew their deposits before the tax collection date; and (3) whether the bank, should it pay the tax, had any legal right to make itself whole from the depositors. As to the third factor, the Court noted that, "[i]n all the cases upholding state taxes against shareholders, without the exclusion of federal obligations owned by the corporation, an express or implied right· of reimbursement was presupposed." *Id.* at 151–52, 75 S.Ct. at 612.

Applying this three-part test to the present case, the Commonwealth Court majority's first finding—that the Commonwealth has no enforcement authority directly against shareholders should Appellant default on the payment of the tax, *see Allfirst Bank*, 895 A.2d at 673—is not substantially in dispute. The second factor is not directly implicated here, as deposits no longer exist upon withdrawal, whereas shares of stock subsist when sold and become the property of the new shareholder. The third factor, however, does apply. This consideration addresses the question that the *Bowers* Court found particularly germane in deciding whether the bank is "a

mere tax-collecting agent" for the shareholders, *Bowers,* 349 U.S. at 148, 75 S.Ct. at 610, or is, in fact, the taxpayer.

In analyzing this element, it bears repeating that Section 701 does not require payment by the owners of the shares, but rather, by the financial institution: "It shall be the duty of every [banking] institution . . . to compute the tax and pay the amount of said tax to the State Treasurer[.]" 72 P.S. § 7701.[11] The bank does have the option of paying the tax from its general fund or from monies collected from its shareholders; thus, nominally, at least, the bank may choose to collect the tax from its shareholders, assuming the shareholders agree to pay over the monies in advance of the tax due date. On the other hand, the statute does not affirmatively require banks to make that choice, as a bank can always comply with the law by paying from its general fund (as occurred in the present circumstances and as appears to be the common practice). Moreover-and of particular importance-once the bank pays the tax, as it must upon arrival of the March 15 deadline, if payment was rendered from its general fund there is no evident means reflected in the statute by which it may force the shareholders to provide indemnification. It is worth noting, in this respect, that the Legislature did, at one time, affirmatively require trust companies to collect tax monies from shareholders prior to remitting them to the Commonwealth: a 1933 amendment to the statute then in effect imposed a legal duty upon the institution "to collect the amount of said tax from its shareholders and pay the same to the State Treasurer, through the Department of Revenue." Act of May 31, 1933, P.L. 1130. *See generally Commonwealth v. First Nat'l Bank of Scranton,* 48 Pa. D. & C. 399, 410 (Ct.Com.Pl. Dauphin 1943) ("It seems reasonable to infer from the testimony that prior to the amendment of 1933 the appellant made no effort to collect this tax from the shareholders,

**11.** Appellant contends that this text indicates that banks do not actually pay the tax, but only the "amount of" the tax which must necessarily have been collected from its shareholders. Because, as developed below, banks lack an effective enforcement mechanism to collect the tax from shareholders, we do not understand the phrase "amount of," as used in this context, to reflect such a specific meaning.

and I think it is fair to assume that this was the general practice."). This aspect of the trust company legislation may be what prompted Mr. Justice Cardozo to remark that the "tax is not laid upon the capital of the trust company. It is laid upon the shares; payment being made in the first instance by the corporation as agent of the shareholders with a remedy over for moneys so advanced," *Schuylkill Trust I*, 296 U.S. at 124, 56 S.Ct. at 36 (Cardozo, J., dissenting), notwithstanding that the company was not given a lien on the stock for the amount of the tax. *Id.* at 118, 56 S.Ct. at 34.[12] In 1945, however, the requirement was lifted and the company was again given the option to remit payment from its general fund absent prior or subsequent collection from shareholders. *See* Act of May 23, 1945, P.L. 908.[13]

 Appellant appears to recognize the importance of this consideration, as it expends substantial effort arguing that the statute does, in fact, provide a means for the bank to make itself whole from its shareholders after paying the tax. The difficulty with this position is that it fails to identify any such means. Indeed, although Appellant states that, "unlike the Ohio statute in *Bowers*, the Pennsylvania Bank Shares Act expressly authorizes banks to recover the tax from their share

12. Although the tax at issue in the *Schuylkill Trust* decisions was a trust company tax, the legislative intent was to treat such companies on the same basis as banks, *see Commonwealth v. Mortgage Trust Co.*, 227 Pa. 163, 176, 76 A. 5, 8 (1909), *quoted in Schuylkill Trust II*, 302 U.S. at 513 n. 9, 58 S.Ct. at 298 n. 9, and the two laws (for banks and trust companies) were merged into one act whose provisions apply to both types of institution prior to the events forming the basis of this litigation. *See supra* note 3.

13. The Commonwealth offers a historical rationale for these developments:

In 1945, the text of the statute changed back to giving banks the option: "... at its option to pay the amount of said tax to the State Treasurer, through the Department of Revenue from its general fund, or to collect the amount of said tax from its shareholders...." ... It is noteworthy that the effect of the 1933 amendment was to ... relieve banks from paying the shares tax, which was another burden that banks faced during the Great Depression.... Contrast this with the economy's full momentum from World War II when the language was reinserted into the Shares Tax.

Brief for Commonwealth at 12 n. 3.

holders," Brief for Appellant at 23, in support of this conclusion Appellant only references the portion of Section 701 that gives the bank the ability remit payment "from the amount of said tax collected from its shareholders." This phrase, however, does not place an affirmative duty upon the bank to collect the tax from shareholders or upon the shareholders to pay the tax, nor does it provide banks with a mechanism to require shareholders to render such payment. Instead, it simply permits the tax liability to be satisfied from shareholder funds if, in fact, the bank has already collected those funds. In this respect the law differs from the Ohio statutes that the Supreme Court identified as reflecting the bank's status as a tax-collecting agent; those enactments (which were not at issue in *Bowers*) expressly placed a lien upon the shares of stock or the deposits, as the case may be, to guarantee the bank's right of indemnification. *See Bowers*, 349 U.S. at 149 n. 8, 75 S.Ct. at 610 n. 8; *see also Corry v. City of Baltimore*, 196 U.S. at 472, 25 S.Ct. at 298; *Utah Mortgage Loan Corp. v. Gillis*, 49 Idaho 676, 290 P. 714, 715–16 (1930). Therefore, it appears that courts will generally find that the true tax incidence falls on the bank's shareholders when the legislation either requires collection from the shareholders in the first instance or otherwise places an affirmative legal duty upon stockholders to pay the tax, or, alternatively, gives the bank some means of obtaining indemnification. *Cf. Bowers*, 349 U.S. at 152, 75 S.Ct. at 612 ("In all the cases upholding state taxes against shareholders, without the exclusion of federal obligations owned by the corporation, an express or implied right of reimbursement was presupposed."). That the present statute does none of these things weighs heavily in favor of finding that its practical effect is to tax the bank's net assets rather than the shareholders; in short, that the bank is not merely a collecting agent for its shareholders, but is, effectively, the taxpayer. *Cf. Fidelity Bank, N.A. v. Commonwealth*, 165 Pa.Cmwlth. 524, 645 A.2d 452, 460 (1994) (observing that, as a distinct class of taxpayer under the bank shares tax, the bank can be required to follow different procedures from other

classes of taxpayers).[14]

Appellant argues that this understanding of the statute would mean that the tax was unconstitutional as applied to national banks from 1945, when banks' duty to collect the tax from their shareholders was removed, until 1969, when Congress first permitted state taxation of national banks. Relatedly, Appellant proffers that, because the Legislature chose to avail itself of the *Van Allen* rule during the time that doctrine was substantively meaningful, the Department cannot now interpret the tax as one levied against the bank rather than the shareholders. This assertion has some resonance, as it appears that the General Assembly's intent all along has been to blend the concepts of taxing financial institutions and taxing their shareholders, perhaps to maximize the opportunity to collect the intended tax upon the value of banks' net values that can be fairly apportioned to Pennsylvania, in light of the former restriction on taxing national banks and continuing limitations arising from intergovernmental immunity, as well as potential issues that might arise from any attempts to enforce property tax obligations against foreign shareholders.

As developed above, however, the concept of taxing shares in the hands of shareholders, as a means of either bringing national banks within the scope of the tax or including federal obligations within the tax base, has always been based on a legal fiction that depended for its legitimacy on the existence of some actual duty on the part of the shareholders to bear the onus of the tax, as shown by the analysis employed in *Bowers*. Although the present statute ostensibly taxes shares, *see* 72 P.S. § 7701 (requiring the bank to include in its report "the *full number of shares*," and requiring the Department to "assess such shares"), again, it lays the burden squarely on the bank to actually pay the tax unless the shareholders voluntarily remit payment. Thus, Appellant may, in fact, be

---

**14.** This conclusion is reinforced by noting that the act's provision for measuring the tax base incorporates a moving six-year average of the bank's taxable net assets. *See* 72 P.S. § 7701.1(a). This shows that the basis of tax liability in any given year is conceptually distinct from the actual value of the shares owned by the stockholders at the time of assessment on January 1st of that year.

correct in its evaluation of the tax's constitutional infirmity during the pre–1969 period, as it is not certain that the similarly hybridized legislation extant in that time frame— which failed to provide a means of ensuring that the shareholders actually shouldered the burden of the tax—would have been deemed sufficient to comply with the *Van Allen* rule, particularly in the wake of *Bowers*. Nevertheless, even if Appellant is correct in this regard, it does not alter our present analysis of the incidence of the bank shares tax and, correspondingly, our interpretation of that statute as comprising a tax on the bank rather than its shareholders.

■ For the reasons stated, we hold that the bank shares tax is, by its core design, as well as in its practical operation and effect, levied against the financial institution rather than its shareholders. We also note that there has been no claim in the present litigation that the tax is not fairly apportioned to reach only value attributable to Pennsylvania. *See generally Unisys Corp. v. Commonwealth, Board of Finance & Revenue*, 571 Pa. 139, 147–48, 812 A.2d 448, 453 (2002) (discussing the concept of apportionment in the context of the state corporate franchise tax).

Accordingly, the judgment of the Commonwealth Court is affirmed.

Chief Justice CAPPY, and Justices CASTILLE, EAKIN and BAER join the opinion.

Justice BALDWIN dissents.